IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LYNNE TURK, individually and as Trustee § | | |
| of the Lynne Caponera Revocable Trust, § | | |
| GARY and LAURIE SPELLMAN, and § | | |
| SUSAN BLOUNT, individually and § | | |
| on behalf of all others similarly situated, § | | |
| § | | |
| *Plaintiffs,* § | CASE NO. _____ | |
| vs. § | | |
| § | | |
| PERSHING, LLC § | | |
| § | | |
| *Defendant.* § | JURY DEMAND | |

## COMPLAINT—CLASS ACTION

Plaintiffs Lynne Turk, individually, as Trustee of the Lynne Caponera Revocable Trust, Gary and Laurie Spellman, and Susan Blount, individually, and on behalf of all others similarly situated, sue the Defendant, Pershing, LLC ("Pershing"), and allege as follows:

## I.
## PARTIES

1.      Plaintiff, Lynne Turk ("Turk") is a citizen and resident of Palm Beach County, Florida. Turk is the trustee of the Lynne Caponera Revocable Trust. She is the sole beneficiary of the Trust and therefore the beneficial owner of the assets of the Trust.

2.      Plaintiffs, Gary and Laurie Spellman (the "Spellmans"), are individuals residing in Travis County, Texas.

3.      Plaintiff, Susan Blount, ("Blount") is an individual residing in Travis County, Texas.

4.      Defendant Pershing, LLC ("Pershing") is a Delaware limited liability company doing business in Texas, and with its principal place of business in New Jersey. Pershing can be served through its registered agent in Texas, Corporation Service Company, at 701 Brazos Street, Suite

1050, Austin, Texas 78701. Pershing is a registered broker-dealer, and it is authorized to conduct business, and on information and belief, does conduct business, in Texas. According to its website, Pershing has over 70 years of experience in the financial industry, and is the largest provider of global clearing services to other firms and institutions, which include the services described in more detail below.

## II.
## VENUE AND JURISDICTION

5.      This is a class action brought pursuant to section 33 of the Texas Securities Act. This class action does not involve a "covered class action," under the federal Securities Litigation Uniform Standards Act of 1998, and is not otherwise subject to that Act. Texas law applies to this action because all of the CDs at issue were sold from Texas. *See Citizens Ins. Co. of America, Inc. v. Daccach,* 217 S.W.3d 430 (Tex. 2007).

6.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district, and under 28 U.S.C. § 1391(c) because Defendant is a corporation subject to personal jurisdiction in this District.

7.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(d)(2) because the amount in controversy exceeds $5,000,000 exclusive of interests and costs, and this is a class action in which a member of the class of Plaintiffs is a citizen of a state different from Defendant.

## III.
## CLASS ACTION ALLEGATIONS

8.      Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The definition of the Plaintiff class in this action is: all persons or entities who

purchased Stanford International Bank Ltd. "certificates of deposit" (the "CDs") during the applicable statute of limitations.

9.    The class meets the requirements for class certification under Rule 23(a) of the Federal Rules of Civil Procedure.

a.   Rule 23(a)(1) ("Numerosity").   The class consists of at least a thousand members who, like Plaintiffs, purchased the Stanford International Bank, Ltd. CDs at issue during the applicable period of limitations.   The exact number of class members is currently unknown to the Plaintiffs, and can only be ascertained through appropriate discovery; however, purchasers of the CDs may be identified from the records maintained by Pershing.   This number is so numerous that joinder of all members of the class is impracticable.

b.   Rule 23(a)(2) ("Commonality").   There are questions of law and fact which are common to the representative parties and each member of the class including: (i) whether Stanford International Bank, Ltd. and its affiliated entities and agents engaged in an unregistered public offering of unregistered securities in violation of the Texas Act; (ii) whether, as a matter of law, all of the sales were made from Texas for purposes of the Texas Securities Act; (iii) whether Pershing was an aider or abettor of Stanford International Bank Ltd. and/or its affiliates in making, participating or aiding in the sales of unregistered securities; and (iii) whether Plaintiffs and the class members are entitled to the remedy of rescission or damages.

c.   Rule 23(b)(3) ("Typicality").   Plaintiffs' claims are typical of the claims of each of the class members.   Plaintiffs suffered the same type of injuries as did

other members of the class in that they purchased unregistered CDs in an unregistered public offering and have the right to rescind such purchase or seek damages as a result thereof.

d. Rule 23(b)(4) ("Adequacy of Representation"). Plaintiffs will fairly and adequately represent and protect the interests of the class and have no interest antagonistic to those of the other class members. Plaintiffs have retained experienced counsel competent in securities litigation and class litigation.

10. The class also meets the requirements of Rule 23(b) of the Federal Rules of Civil Procedure. The common issues outlined herein predominate over any individual issues in this case. A class action is superior to all other available means for the fair and efficient adjudication of this controversy because: (1) it is economically impracticable for class members to prosecute individual actions against Pershing; (2) other than federal litigation in Florida and litigation in Louisiana, Plaintiffs are aware of no other litigation concerning the claims against Pershing; (3) it is desirable to concentrate these claims against Pershing in a single forum so as to avoid varying and disparate results; and (4) there is no difficulty likely to be encountered in the management of this case as a class action. In addition, individual actions by the class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct. Individual actions would also cause a risk of adjudications that are dispositive of the interests of other members that are not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

11. Pleading further and in the alternative, Plaintiffs Gary and Laurie Spellman and Susan Blount plead the existence of a sub-class defined as: all persons or entities who purchased Stanford International Bank, Ltd. "certificates of deposit" (the "CDs") during the applicable

statute of limitations period and who, like the Spellmans and Blount, were residents of the State of Texas or otherwise subject to Texas law at the time of the purchase.

12.     This subclass meets the requirements for certification under Rule 23(a) of the Federal Rules of Civil Procedure.

     a.  Rule 23(a)(1) ("Numerosity").  The class consists of at least several hundred members who were residents of Texas or are otherwise subject to Texas law at the time of purchase of the CDs at issue.  The exact number of class members is currently unknown to Plaintiffs, and can only be ascertained through appropriate discovery; however, the purchasers of the CDs and their residency at the time of purchase may be identified from records maintained by Pershing.  This number is so numerous that joinder of all members of the class is impracticable.

     b.  Rule 23(a)(2) ("Commonality").  There are questions of law and fact that are common to the representative party and each member of the class, including: (i) whether Stanford International Bank, Ltd. and its affiliated entities and agents engaged in an unregistered public offering of unregistered securities in violation of the Texas Act; (ii) whether Pershing was an aider or abettor of Stanford International Bank, Ltd. and/or its affiliates in making, participating or aiding in the sales of unregistered securities to class members; and (iii) whether Plaintiffs and the class members are entitled to the remedy of rescission or damages.

     c.  Rule 23(a)(3) ("Typicality"). Plaintiffs' claims are typical of the claims of each of the class members.  Plaintiffs suffered the same type of injury as did

other members of the class in that they purchased unregistered CDs in an unregistered public offering and have the right to rescind such purchase or seek damages as a result thereof.

d.  Rule 23(a)(4) ("Adequacy of Representation").  Plaintiffs will fairly and adequately represent and protect the interests of the class and have no interest antagonistic to those of the other class members.  Plaintiffs have retained experienced counsel competent in securities litigation and class litigation.

13.    The subclass also meets the requirements of Rule 23(b) of the Federal Rules of Civil Procedure.  The common issues outlined herein predominate over any individual issues in this case.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy because: (1) it is economically impracticable for class members to prosecute individual actions against Pershing; (2) other than federal litigation in Florida and state litigation in Louisiana, Plaintiffs are aware of no other litigation concerning the claims against Pershing; (3) it is desirable to concentrate these claims against Pershing in a single forum so as to avoid varying and disparate results; and (4) there is no difficulty likely to be encountered in the management of this case as a class action.  In addition, individual actions by the class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct.  Individual actions would also cause a risk of adjudications that are dispositive of the interests of other members that are not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

14.    Pleading further and in the alternative, Plaintiff Lynne Turk pleads the existence of a sub-class defined as: all persons or entities who purchased Stanford International Bank Ltd. "certificates of deposit" (the "CDs") during the applicable statute of limitations period and who,

like Plaintiff Lynne Turk, were residents of the State of Florida or otherwise subject to Florida law at the time of the purchase. The claims of this sub-class are brought pursuant to the Florida Securities and Investor Protection Act (the "Florida Act"), sections 517.07, 517.211, Florida Statutes.

15.    This subclass meets the requirements for certification under Rule 23(a) of the Federal Rules of Civil Procedure.

      a.   Rule 23(a)(1) ("Numerosity"). The class consists of at least several hundred members who were residents of Florida or are otherwise subject to Florida law at the time of purchase of the CDs at issue. The exact number of class members is currently unknown to Plaintiff, and can only be ascertained through appropriate discovery; however, the purchasers of the CDs and their residency at the time of purchase may be identified from records maintained by Pershing. This number is so numerous that joinder of all members of the class is impracticable.

      b.   Rule 23(a)(2) ("Commonality"). There are questions of law and fact that are common to Plaintiff and each member of the class, including: (i) whether Stanford International Bank, Ltd. and its affiliated entities and agents engaged in an unregistered public offering of unregistered securities in violation of the Florida Act; (ii) whether Pershing was an aider or abettor of Stanford International Bank, Ltd. and/or its affiliates in making, participating or aiding in the sales of unregistered securities to class members; and (iii) whether Plaintiff and the class members are entitled to the remedy of rescission or damages.

    c.   Rule 23(a)(3) ("Typicality"). Plaintiff's claims are typical of the claims of each of the class members.  Plaintiff suffered the same type of injury as did other members of the class in that she purchased unregistered CDs in an unregistered public offering and has the right to rescind such purchase or seek damages as a result thereof.

    d.   Rule 23(a)(4) ("Adequacy of Representation").  Plaintiff will fairly and adequately represent and protect the interests of the class and has no interest antagonistic to those of the other class members.  Plaintiff has retained experienced counsel competent in securities litigation and class litigation.

16.    The subclass also meets the requirements of Rule 23(b) of the Federal Rules of Civil Procedure.  The common issues outlined herein predominate over any individual issues in this case.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy because: (1) it is economically impracticable for class members to prosecute individual actions against Pershing; (2) other than federal litigation in Florida and state litigation in Louisiana, Plaintiff is aware of no other litigation concerning the claims against Pershing; (3) it is desirable to concentrate these claims against Pershing in a single forum so as to avoid varying and disparate results; and (4) there is no difficulty likely to be encountered in the management of this case as a class action.  In addition, individual actions by the class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct.  Individual actions would also cause a risk of adjudications that are dispositive of the interests of other members that are not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

## IV.
## FACTS

### The Stanford Ponzi Scheme and the Offer and Sale of Unregistered Securities

17.     Plaintiffs purchased so-called "certificates of deposit" ("CDs") purportedly issued by Stanford International Bank Ltd. ("SIB"). SIB purports to be a foreign private bank located in Antigua, West Indies. Antigua is well known in the financial industry to have little to no regulation or oversight over the banks operating there, and is notorious as a money laundering haven.

18.     All of the CDs were sold by and through SIB's affiliated U.S. broker dealer/investment advisors, Stanford Group Company ("SGC"), a Houston, Texas based corporation. SGC is a broker/dealer and investment advisor registered with the Securities and Exchange Commission ("SEC") and the State of Texas. SIB's and SGC's primary product was the CD.

19.     Stanford Capital Management ("SCM") is also a broker/dealer and investment advisor registered with the SEC.

20.     By the end of the year 2008, SGC had sold approximately $7.2 billion in CDs for SIB through their affiliated broker/dealers and brokers employed by them. Upon information and belief, these CDs were sold from Texas to individuals and entities worldwide, with at least hundreds of millions of dollars worth sold in Texas or to Texas residents or in Florida or to Florida residents, including the sales to Plaintiffs.

21.     SIB, SGC, and SCM were at all relevant times affiliated with and controlled by R. Allen Stanford ("Stanford"). Stanford, through these affiliated entities, engaged in a massive Ponzi scheme. In carrying out this scheme, Stanford misappropriated billions of dollars in investors' funds.

9

22.     In an effort to conceal the fraudulent conduct and maintain the flow of investor money to SIB, Stanford fabricated the performance of SIB's investment portfolio showing purported investment returns that were consistently in excess of those reported with respect to any comparable CD investment.  These reported CD returns were unlikely or impossible, and bore no relationship to the performance of SIB's actual investment results.

23.     The SEC has commenced an action against Stanford, its affiliates, and others concerning this Ponzi scheme.

24.     This Ponzi scheme involved the sale, through an illegal, unregistered public offering, of the SIB CDs by SGC from Texas to investors in Texas, other States, and worldwide.

25.     The CDs are "securities" as that term is defined in Section 4(a) of the Texas Securities Act.  The CDs were not insured, nor were they subject to regulatory schemes similar to that in the United States or Texas.

26.     The offering of the CDs, conducted on a continuous basis from at least 2005 through 2008, was described in offering materials as a private placement, and SGC purportedly offered the CDs pursuant to an exemption from registration under the Texas Securities Act and the Florida Act.

27.     However, the offering of CDs was in fact an unregistered public offering made in violation of Article 581 of the Texas Act and of Chapter 517 of the Florida Act. It was an integrated offering under Texas and Florida securities laws, and, on information and belief, involved each of the following factors indicating that it was a public offering and not a private offering exempt from registration:

> a.  The integrated offering involved general solicitation. This general solicitation by SIB through SGC and its U.S. affiliates, agents and brokers included

general public advertisements, publicly distributed magazine articles and other communications and media published in print and distributed broadly for general distribution in the United States (including in Texas and Florida) to offerees and purchasers of the CDs. SIB has acknowledged that it employed marketing literature other than its private placement memorandum on a regular basis.

b.  The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas and Florida, of the Stanford financial products, including CDs.

c.  The integrated offering involved seminars and meetings conducted in the United States (including Texas and Florida) and Antigua, West Indies. The integrated offering was conducted through the use of sales seminars, "road shows", and meetings directed at potential offerees and purchasers.

d.  The integrated offering involved offers to thousands of offerees and purchases by thousands of offerees.  The integrated offering involved offers to, and purchases by, at least hundreds of Texas and Florida residents or those otherwise subject to Texas or Florida law.

e.  The aggregate size of the sales of CDs during this period was approximately $7.2 billion.  The aggregate size of the sales in Texas from this period was at least several hundred millions of dollars.  The aggregate size of the sales in Florida from this period was at least several hundred millions of dollars.

f.  The offering was made to investors with whom SGC had no pre-existing relationship, through brokers of an affiliate of SGC who were paid substantial

and excessive undisclosed commissions in connection with the CDs.

**Pershing Participated and Aided in the Sale of Unregistered Securities**

28.     As set forth above, by the end of 2008, SIB had sold approximately $7.2 billion in CDs through SGC by publicly advertising their safety and security, consistent double digit returns, and by fabricating reasons why these CDs yielded a return that greatly exceeded that of commercial bank CDs offered in the United States.  The Stanford CDs were not certificates of deposit as customarily issued by United States banks.  Instead, the CD proceeds were invested in speculative, illiquid, high-risk investments by a leveraged hedge fund.  At all relevant times, with the information available to it, Pershing either knew or should have known these facts.

29.     Pershing acted as clearing broker for SGC from December 2005 until December 2008.  At least $500 million in CD purchases were made through Pershing as SGC's clearing firm.  Pershing was handsomely compensated for these services.

30.     Throughout the relevant time period, SGC "cleared" all of its business, including its Texas and Florida business, through Pershing pursuant to a fully disclosed clearing agreement.  In its capacity as a clearing broker, Pershing held all of the cash assets of SGC customers and all the securities of SGC customers.

31.     In order to effect the unregistered public offering of securities, SGC employed Pershing to aid and abet the sale of the unregistered securities. Pershing actively and personally participated and aided in the sale of the unregistered CDs, and engaged in conduct that induced purchasers to invest in CDs.  Pershing's participation included, but is not limited to, the conduct described below.  Pershing was also responsible for making assessments of whether or not to accept an order for processing, whether to execute a transaction in a customer account, and for ensuring that the introducing broker was meeting set capital and other regulatory requirements.

32.     Pershing transferred hundreds of millions of dollars from the securities accounts it maintained for U.S. customers of SGC, including Plaintiffs, to SIB in order to effect the sale of CDs.  Pershing transferred money from SGC customers and their accounts to SIB in Antigua, even though each of these thousands of wire transfers from a domestic account to an Antiguan bank for the purchase of a CD was highly unusual in and of itself.

33.     Pershing transferred funds from SGC customers' accounts for the purchase of CDs, and Pershing issued confirmations and statements to customers reflecting the transfer of such funds.

34.     Upon information and belief, Pershing also extended credit to customers to enable them to purchase CDs.  Pershing provided loans and margin financing for Stanford customers to purchase CDs, and Pershing received interest on such loans.

35.     Pershing's participation and aid was motivated in part by a desire to serve its own financial interests, as well as the financial interests of SGC, SIB and their affiliated entities. Pershing profited from each CD sale because it received compensation from SGC for processing each CD purchase.

36.     Moreover, at all relevant times Pershing, a sophisticated and experienced broker-dealer, acted with conscious indifference and with reckless disregard to the fact that the offering of the CDs through SGC was an illegal, unregistered public offering.  For instance, Pershing ignored that: (i) SIB generally solicited CD investors through television and other media ads; and (ii) many thousands of investors purchased the CDs.  Yet Pershing willingly lent its good name and reputation to enhance SIB's and SGC's appearance of legitimacy for the sake of protecting its profits from sales of the unregistered CDs.

37.     Pershing acted with conscious indifference and reckless disregard knowing that the offering was not registered and not otherwise exempt from registration under state or federal securities laws.

38.     Pershing was at all times aware that SIB was paying SGC and its brokers excessive compensation for the sale of the CDs, because Pershing maintained the brokerage accounts for these brokers and saw the commissions paid into such accounts.  SGC's brokers were paid an upfront and "trailing" fee in connection with the CDs that was well in excess of industry standards for commissions with respect to CDs.  By ignoring these excessive commissions, Pershing acted with conscious indifference to the fact that SIB and SGC were engaged in an aggressive sales effort with respect to the CDs inconsistent with the limitations on such sales efforts for legitimate private placements pursuant to Texas and Florida law.

39.     As a registered broker-dealer and clearing firm, Pershing had an affirmative obligation under federal law to monitor SGC, and to identify and report any suspicious activity to the U.S. Treasury Department's Crimes Enforcement Network.   Pershing was required to file a "suspicious activity report" ("SAR") of any "possible violation of law or regulation," including any transaction Pershing "knows, suspects" or has reason to believe involves funds derived from an illegal activity.  *See* 31 C.F.R. § 103.19(a)(2).

40.     Upon information and belief, Pershing expressed internal concerns with respect to the CD offering and the financial status of SIB and the authenticity and validity of the returns purportedly being paid on the CDs, yet Pershing continued to aid and participate in the purchase and sale of the CDs.  Indeed, given the numerous red flags being waived right under its nose, Pershing could hardly fail to realize that SIB was involved in a scam.  For instance:

- Stanford had previously operated a bank in Monsserrat that had its license revoked. Stanford then began "banking" in Antigua.

- Stanford was sued by the U.S. government in 1990 for failing to file a tax return.

- Since the mid-1990s, the U.S. government had voiced concerns that Antigua was a haven for money laundering.

- Beginning in 1995, Stanford made large loans to the financially weak government of Antigua.  By 2004, this indebtedness had grown to $87 million, nearly half the government's annual tax revenue.

- The enormous levels of CD sales achieved by SIB through SGC were a result of promising investors interest rates far above rates offered by other banks.

- SIB claimed to be able to pay higher rates because of a unique investment strategy that had yielded double-digit returns for fifteen straight years.  The earnings claimed by SIB approached impossibility.

- SIB paid SGC brokers an exorbitant commission rate of 1% of all amounts invested in SIB's CDs.  This rate was unheard of in the CD industry and provided massive incentive for SGC brokers to push investors into the CDs.

- In 2005, a lawsuit was brought in U.S. District Court alleging that SIB was aiding and abetting a Ponzi scheme that targeted citizens of Venezuela.  SIB settled out of court.

- In 2006, a lawsuit was brought by a former Stanford employee alleging that SIB was operating a Ponzi scheme.  SIB settled out of court.

- In 2007 and 2008, FINRA levied at least five separate fines against SGC for violations such as using "misleading, unfair and unbalanced information" in the sale of SIB CDs.

- In early 2008, two executives of SIB sued SIB in Texas state court alleging that the company was engaged in fraud involving the falsification of its financial statements.

- SIB's alleged auditor for its multi-billion dollar business was a tiny, Antigua-based accounting firm that the SEC had difficulty even reaching in early 2009.

41.     Nonetheless, Pershing failed to timely file a SAR, inform regulatory authorities, or otherwise act based on what it knew or should have known was an illegal unregistered sale of securities.  Pershing's failure to act directly aided Stanford in its ability to continue to violate Texas and Florida securities laws over a period of many years through the continued sale of the bogus CDs.

42.     In short, the unlawful sales of securities could not have been made but for Pershing's participation and aid.  Pershing played a necessary and critical role in the sale of the unregistered securities, which could not have occurred but for Pershing's conduct.  Despite the numerous "red flags" related to the illegal sale of the CDs, Pershing looked the other way to preserve its lucrative stream of income from the sale of the CDs.

43.     Pershing exercised professional expertise and judgment by participating and aiding in the illegal offering and sale of unregistered securities set forth throughout this complaint.

44.     In participating and aiding in an illegal offering of unregistered securities, Pershing acted beyond the scope of its ministerial and ordinary administrative functions as a clearing firm.

## Count I
### (Sale of Unregistered Securities under the TSA)

45.     Plaintiffs re-allege the allegations set forth in Paragraph 1 through 43, as if fully set forth herein.

46.     This is a claim against Pershing for violations of Article 581 of the Texas Act arising from the sale of unregistered securities from the State of Texas, or, with respect to the Texas subclass, in the State of Texas.  The offers of CDs through SGC from Texas violated Tex. Rev. Civ. Stat. Ann. article 581-33(A), which provides a private right of action for violations of Section 7 of the Texas Securities Act (the "Act").

47.     Section 7 provides that "[n]o dealer or agent shall sell or offer for sale any securities" unless the security is "exempt" under Section 5 or 6, or "until the issuer of such securities or a dealer registered under the provisions of this Act shall have been granted a permit by the Commissioner."  Tex. Rev. Civ. Stat. Ann. art. 581-7(A)(1).

48.     The CDs are securities as defined in section 4(A) of the Texas Act.

49.     The CDs and CD transactions are not exempt from registration under the Act, nor were the CDs properly registered as required.

50.     Pershing's conduct satisfies Section 33(F), which renders jointly and severally liable each person making the sale and, "[a] person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security."

51.     Pershing personally participated in and/or aided in the sale of CDs with knowledge that the offer was not exempt from Texas registration requirements.

52.     Pursuant to section 33 of the Act, Plaintiff and the Class are entitled to recover recessionary damages or actual damages together with interest thereon.

**Count II (in the alternative, as to Florida sub-class only)**
**(Sale of Unregistered Securities under Florida Securities Act)**

53.     Plaintiffs re-allege the allegations set forth in Paragraph 1 through 43, as if fully set forth herein.

54.     This is a claim against Pershing for violations of Chapter 517 of the Florida Act arising from the sale of unregistered securities in the State of Florida.  The offers of CDs to residents of Florida, and non-residents of Florida whose CD purchases are subject to Florida law, violated section 517.211, Florida Statues, which provides a private right of action for violations of section 517.07, Florida Statutes.

55.     Section 517.07 provides that "it is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

56.     The CDs are securities as defined in section 517.021(21), Florida Statutes.

57.     The CDs and CD transactions are not exempt from registration under the Florida Act, nor were the CDs properly registered as required.

58.     Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

59.     Pershing acted as an agent for seller SIB and its affiliated entities, including SGC, and Pershing personally participated in and/or aided in the sale of CDs with knowledge that the offer was not exempt from Florida registration requirements.

60.     Pursuant to section 517.211, Florida Statutes, Plaintiff and the Sub-Class are entitled to recover recessionary damages or actual damages together with interest thereon.

### PRAYER

Plaintiffs respectfully request:

A.  An order certifying the proposed Class or in the alternative, the proposed subclasses, or an alternative class or subclasses as appropriate under Rule 23 of the Federal Rules of Civil Procedure;

B.  That a judgment be rendered against Defendant in favor of Plaintiffs and the certified class or subclasses for rescission and/or damages, in an amount to be proven at trial;

C.  An order granting reasonable attorneys' fees and costs, as well as pre- and post-judgment interest at the maximum legal rate; and

D.  For such other and further relief, both at law and equity, to which Plaintiffs and the certified Class may be justly entitled.

### JURY DEMAND

Plaintiffs demand a trial by jury in this cause and hereby provides notice to Defendant that the jury fee has been paid.

DATED this the 18th day of November, 2009.

Respectfully submitted,

HOHMANN, TAUBE & SUMMERS, L.LP

By: Guy Hohmann, by Guy Lewis w/permission

Guy M. Hohmann
State Bar No. 09813100
Joseph Brophy
State Bar No. 00787146
Ryan T. Shelton
State Bar No. 24037484
100 Congress Avenue, 18th Floor
Austin, Texas 78701
(512) 472-5997
(512) 472-5248 (FAX)
guyh@hts-law.com
joeb@hts-law.com
ryans@hts-law.com

GEORGE & BROTHERS, LLP

By: Gary L L

R. James George, Jr.
State Bar No. 07810000
Gary L. Lewis
State Bar No. 12277490
114 W. Seventh Street, Suite 1100
Austin, Texas 78701
(512) 495-1400
(512) 499-0094 (FAX)
rjgeorge@georgeandbrothers.com
gllewis@georgeandbrothers.com

BEASLEY HAUSER KRAMER
LEONARD & GALARDI, P.A.
James W. Beasley, Jr.

19

Florida Bar No. 145750
Joseph G. Galardi
Florida Bar No. 0180572
Flagler Center, Suite 1500
505 South Flagler Drive
West Palm Beach, Florida 33401
(561) 835-0900
(561) 835-0939 (FAX)
galardi@beasleylaw.net


BLACKNER, STONE & ASSOCIATES
Lesley Blackner, Esquire
Florida Bar No. 654043
123 Australian Avenue
Palm Beach, FL  33480
(561) 659-5754
(561) 659-3184 (FAX)
lblackner@aol.com


**ATTORNEYS FOR PLAINTIFFS**

JS 44 (Rev. 12/07)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Lynn Turk, individually and as Trustee of the Lynn Caponera Revocable Trust, Gary and Laurie Spellman, and Susan Blount,

**DEFENDANTS**
Pershing, LLC

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
R. James George, Jr. and Gary L. Lewis of George & Brothers, LLP, 114 West 7th Street, 1100 Norwood Tower, Austin, Texas

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332(d)(2)
Brief description of cause:
Violation of Texas and Florida Securities Acts

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____
DOCKET NUMBER _____

DATE 11/17/2009
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____