UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **LYNNE TURK, individually and as Trustee** | § | |
| **of the Lynne Caponera Revocable Trust,** | § | |
| **SUSAN BLOUNT, HORACIO MENDEZ and** | § | |
| **ANNALISA MENDEZ, individually and on** | § | |
| **behalf of a class of all others similar situated,** | § | |
| | § | |
| **Plaintiffs** | § | **CASE NO. 3:09-cv-02199-N** |
| | § | |
| **vs.** | § | |
| | § | |
| **PERSHING LLC** | § | |
| | § | |
| **Defendant** | § | |

_____

**PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT - CLASS ACTION**
_____

NOW COME **PLAINTIFFS, LYNNE TURK, individually and as Trustee of the Lynne Caponera Revocable Trust, SUSAN BLOUNT, HORACIO MENDEZ and ANNALISA MENDEZ, individually and on behalf of a class of all others similarly situated**, (collectively hereinafter "Class Plaintiffs"), and file this their Amended Consolidated Complaint - Class Action against Defendant, **PERSHING LLC** (referred to hereinafter as "Pershing"). The following allegations are based on information and belief (such information and belief being based, in part, upon the investigation conducted by Plaintiffs' counsel), except those allegations that pertain to the named Plaintiffs and Plaintiffs' counsel, which are based upon personal knowledge. The named Plaintiffs and Plaintiffs' counsel expressly reserve the right to supplement or amend this Complaint based upon Plaintiffs' counsel's ongoing investigation of the facts and circumstances concerning the allegations in this Complaint. In support of this Complaint, the named Plaintiffs show the Court as follows:

## I.    <u>PARTIES</u>

1.      Plaintiff Lynne Turk is a citizen and resident of Palm Beach County, Florida. Turk is the trustee of the Lynn Caponera Revocable Trust (the "Trust"). She is the sole beneficiary of the Trust and therefore the beneficial owner of the assets of the Trust.

2.      Plaintiff Susan Blount is an individual residing in Travis County, Texas.

3.      Plaintiff, Horacio Mendez, is a citizen of the United States of America currently residing in Travis County, Texas.

4.      Plaintiff, Annalisa Mendez, is a citizen of the United States of America currently residing in Travis County, Texas.

5.      Additionally, this case seeks certification of:

(i) a class of all investors who, as of February 16, 2009, had purchased and still held SIBL CDs and/or otherwise maintained deposit accounts with SIBL through brokerage accounts established at SGC or IRA accounts at STC;  or in the alternative, certification of:

(ii) a class of all investors who, as of February 16, 2009, had purchased and still held SIBL CDs and/or otherwise maintained deposit accounts with SIBL through brokerage accounts established at SGC or IRA accounts at STC, and whose funds were wire transferred by Pershing   to fund the purchase of SIBL CDs between December 27, 2005 and February 16, 2009; or in the further alternative, certification of:

(iii) a class of all investors who, as of February 16, 2009, had purchased and still held SIBL CDs, where the purchase involved funds transferred to, from or through Pershing, or that in any way involved Pershing, between December 27, 2005 and February 16, 2009, and who were residents of the State of Texas or otherwise subject to Texas law at the time of the purchase; and/or:

(iv) a class of all investors who, as of February 16, 2009, had purchased and still held SIBL CDs, where the purchase involved funds transferred to, from or through Pershing, or that in any way involved Pershing between December 27, 2005 and February 16, 2009, and who were residents of the State of Florida or otherwise subject to Florida law at the time of the purchase.

6.      Defendant Pershing LLC ("Pershing") is a Delaware limited liability company doing business in Texas, and with its principal place of business in New Jersey.  Pershing can be served through its registered agent in Texas, Corporation Service Company, at 701 Brazos Street, Suite 1050, Austin, Texas 78701.  Pershing is a registered broker-dealer, and it is authorized to conduct business, and on information and belief, does conduct business, in Texas.  According to its website, Pershing has over

70 years of experience in the financial industry, and is the largest provider of global clearing services to other firms and institutions, which include the services described in more detail below.

## II.   JURISDICTION & VENUE

7.     This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(A) because this is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of states different from Defendants.

8.     This Court has personal jurisdiction over non-resident Pershing under the Texas Long Arm Statute.  Pershing has conducted continuous and systematic business in the State of Texas for many years and is therefore subject to general jurisdiction.  Furthermore, as described herein, Pershing has engaged in specific jurisdiction contacts with the State of Texas, specifically with Stanford Financial Group, including Stanford Group Company, headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore Pershing has done business and committed torts, in part, in the State of Texas.

## III.   FACTUAL BACKGROUND

9.     For the last five years of its existence, the Stanford financial empire, as detailed below, was aided and abetted by Pershing, which acted as its custodian and clearing broker for its Houston broker-dealer operations, despite the warning signs that should have been obvious to      Pershing— warning signs that developed throughout Stanford's history and which Pershing      should have discovered during its review of the Stanford operations.  An appreciation for the basis for Pershing's culpability thus requires a thorough understanding of Stanford's history and operations.

### A.    The Stanford Financial Empire

10.    From the mid-1980s through February 2009, R. Allen Stanford ("Stanford") — a former gym owner from Mexia, Texas — built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment funds.  The empire was comprised of over 140 companies from across the globe, all of which were ultimately owned by Stanford himself.  The companies operated under the brand name "Stanford Financial" with their worldwide headquarters located in Houston, Texas.  The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial Group") included:  the Houston, Texas-based registered broker/dealer and investment adviser company Stanford Group Company ("SGC"); the Antiguan-based offshore bank Stanford International Bank Ltd. ("SIBL"); Stanford Trust Company (Louisiana) ("STC"); Stanford Trust Company (Antigua); and the representative offices of Stanford Trust Company (Antigua), d/b/a "Stanford Fiduciary Investor Services" ("SFIS"), that operated in Miami, Houston and San Antonio.  Stanford Financial Group was controlled and managed principally from Houston, Texas in the United States.

11.    Stanford Financial Group's offshore banking operation began as Guardian International Bank in the mid 1980s.  Over the years, Stanford Financial Group grew into a full-service financial services firm, offering worldwide clients private banking and U.S.-based broker/dealer and investment adviser services.  Stanford Financial Group gave its clients all the appearances of a highly successful operation, with lavish offices in some of the world's premier cities.  Stanford himself made the Forbes' list of the richest people in the world with a personal fortune estimated at $2.2 billion.

12.    The entire Stanford Financial Group operation was fueled by one primary product:  CDs issued by SIBL, the Antiguan offshore bank wholly owned and controlled by Stanford himself.

Clients who were introduced to the Stanford Financial Group, whether in Houston, Miami, Caracas, or Mexico City, quickly learned that the main financial product peddled by the group was the SIBL CD.  The SIBL CDs were sold worldwide by a web of different Stanford Financial Group promoter companies, including SGC, STC and SFIS, whose sole function was to promote the sale of SIBL CDs.  For example, to access additional investor capital in Latin America, Stanford Financial Group established representative offices in Colombia (Stanford Group Columbia a/k/a Stanford Bolsa y Banca), Ecuador (Stanford Group Ecuador a/k/a Stanford Group Casa de Valores, S.A. and Stanford Trust Company Administradora de Fondos y Fideicomisos, S.A.), Mexico (Stanford Group Mexico a/k/a Stanford Group Mexico S.A. de C.V. and Stanford Fondos), Panama (Stanford Group Panama a/k/a Stanford Bank Panama and Stanford Casa de Valores Panama), Peru (Stanford Group Peru a/k/a Stanford Group Peru S.A. Sociedad Agente de Bolsa), and Venezuela (Stanford Group Venezuela a/k/a Stanford Group Venezuela C.A., Stanford Bank Venezuela, and Stanford Group Venezuela Asesores de Inversion).  These foreign offices were ultimately controlled by Stanford Financial Group's entities and employees in Houston, Texas.  By 2009, SIBL's vast network of domestic and foreign offices had sold over $7.2 billion in CDs.

### B.  Stanford Financial Group's Operations in the United States

13.     For the first decade of its CD sales operations, 1985 to 1995, Stanford Financial Group and its offshore bank (whether Guardian International Bank or SIBL) targeted a Latin American clientele.  But by the mid 1990s, Stanford Financial Group had begun to establish a foothold in the United States.  In 1995, Stanford Financial Group established SGC, a Texas corporation, and in February 1996, SGC was registered as a broker/dealer and investment adviser.  SGC established offices initially in Houston and Baton Rouge.  Stanford Financial Group began the practice of "head hunting" for U.S. brokers, bankers, and other financial advisers, paying enormous signing bonuses to

the brokers, bankers and other financial advisers to leave their jobs at other firms and transfer their book of clients over to SGC.  Fueled by this influx of veteran bankers, brokers and investment advisers, SGC grew from 6 branch offices in the United States in 2004 to 33 offices across the United States in 2009.

14.     Early on, Stanford Financial Group recognized the huge potential for marketing its offshore CDs to Latin Americans via the "gateway" city of Miami.  In 1998, Stanford Financial Group established SFIS, a representative office of SIBL in Miami, and disguised SFIS as the representative office of Stanford Trust Company (Antigua) in order to evade U.S. banking regulations.  The Miami office of SFIS generated over $1 billion in SIBL CD sales for Stanford Financial Group, primarily from sales to investors from South American countries such as Colombia, Ecuador, Peru, and Venezuela.  Stanford Financial Group also set up SFIS offices in Houston and San Antonio, Texas to cater to Mexican investors visiting those cities and bring in more investment money.

15.     Stanford Financial also increased sales of SIBL CDs by targeting the IRA accounts of SGC's U.S. investors.  In 1998, Stanford Financial Group established STC in Baton Rouge, Louisiana to serve as the trustee/custodian for IRA accounts owned by investors referred from SGC — a service that traditional IRA custodians would *not* provide.  After STC was established, SGC's brokers and investment advisers convinced the IRA investors to invest some or, in most cases, ***all*** of their IRA accounts into the SIBL CDs.

16.     For all of the Stanford promoter companies — whether SGC, SFIS, or STC — the primary product marketed and sold was the SIBL CD, as it sustained Stanford Financial Group's operations and paid the employees' exorbitant salaries and bonuses.  The promoter companies were all members of Stanford Financial Group, were ultimately owned by Stanford himself, were interconnected via

intercompany marketing and referral fee agreements, and were controlled by Stanford Financial Group in Houston, Texas.

17.     Houston, Texas was thus the nerve center and principal base for all of Stanford Financial Group's operations, including SIBL, SGC, SFIS, and STC.  STC was wholly owned and controlled by Houston-based SGC, and virtually every member of the STC Board of Directors at any time was an employee of SGC.  SGC directed the operations of STC and provided all administrative functions from Houston.  STC's annual budget and financial forecasts were prepared by SGC in Houston, and even reimbursement of expenses for STC employees was handled by Stanford Financial Group's corporate accounting team in Houston.

18.     All the sales and marketing practices for the entire Stanford Financial Group (including SIBL), as well as general operational and administrative functions, were managed under the overall direction, supervision, and control of the Houston offices.  SIBL itself never had a marketing or sales arm in Antigua.  Stanford Financial Group used entities like SGC, SFIS, and STC to continue selling SIBL CDs and bring in new money.

19.     The head of Stanford Financial Group's global sales operation for the marketing and sale of SIBL CDs was located in Houston, Texas.  All the sales practices, directives, techniques, strategies and reward programs for Stanford Financial Group, including SIBL, were developed and crafted in Houston and disseminated to the various Stanford Financial Group branch offices around the world.  All the sales force training manuals, promotional literature, and materials for SIBL, including the Spanish-language promotional materials used by SGC, STC and SFIS, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other Stanford Financial Group sales offices around the world to be utilized by the local sales force in each country.

20.     In addition, mandatory sales training for the Stanford Financial Group sales force for SIBL was conducted principally in Houston (known to the foreign financial advisers as the "Houston experience") by Stanford Financial Group personnel.   In those mandatory training sessions, sometimes twice a year, Stanford Financial Group's financial advisers ("FAs") were trained to sell the image of Stanford Financial Group.  The "script" for why SIBL was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled into their heads again and again.

### C.     The Anatomy of the Stanford Ponzi Scheme

21.     In reality, Stanford Financial Group's empire was a massive, worldwide Ponzi scheme. Stanford Financial Group violated the laws of virtually every country it operated in, including the United States, Ecuador, Mexico, Venezuela, and Antigua.  Stanford Financial Group's repeated commission of regulatory fraud in various countries enabled and fostered the growth of SIBL's CD sales.

22.     The gist of the fraud was actually quite simple:  (i) sell the offshore SIBL CDs through a flashy marketing campaign designed to trick investors into believing they were purchasing safe, secure (even insured) and liquid CDs that were regulated in the United States because SGC was a U.S. licensed broker/dealer; while at the same time (ii) maintaining a "Wizard of Oz" veil of secrecy over SIBL's purported investment portfolio and the use of CD investors' money.  Thus Stanford Financial Group went to great lengths to keep prying eyes, particularly regulatory eyes, away from SIBL's operations.

23.     SIBL was actually insolvent (i.e., its liabilities exceeded the fair value of its assets) from at least 2004 and probably for much longer, yet it continued selling CDs to the bitter end.  Stanford Financial Group induced investors to buy CDs by offering above-market rates, issuing financial

statements and other data that significantly overstated SIBL's earnings and assets, and misrepresenting its business model, investment strategy, financial strength, safety and nature of its investments, and other facts important to investors.  In reality, SIBL's earnings and assets were insufficient to meet its CD-payment obligations, so the only way Stanford Financial Group could keep the scheme going was by using proceeds from new CD sales to pay redemptions, interest, and operating expenses.  SIBL's purported assets were fraudulently inflated to offset CD obligations and its revenues were "reverse-engineered" to arrive at desired levels.  Each year or quarterly reporting period, Stanford Financial Group would simply determine what level of fictitious revenue SIBL "needed" to entice investors, satisfy regulators, and purport to cover its CD obligations and other expenses.  Stanford Financial Group would then "plug"  the necessary revenue amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternatives) of a fictitious investment allocation.

### a.    Guardian International Bank and Stanford International Bank Ltd.

24.    Stanford opened his first offshore bank, Guardian International Bank ("Guardian Bank"), in 1985 on the tiny Caribbean island of Montserrat (12,000 residents).  The following year, Stanford established Guardian Bank's representative offices in Miami, Florida and Houston, Texas under the name of Guardian International Investment Services ("Guardian Services"), which was designed to cater to wealthy Latin American clients.  Stanford brought in his old college roommate, James Davis, to help run operations.  The Guardian Bank and Guardian Services model was an early blueprint for what later became the Stanford Financial Group empire.  Guardian Bank offered CDs with rates typically 2% to 3% above the average rates available in the market, all with the confidentiality associated with offshore private banking.

25.     By 1989, the banking system in Montserrat came under investigation by British and U.S. authorities.  Consequently, Guardian Bank itself came under scrutiny for possible drug money laundering, so Stanford looked to move his bank to a new location.  In December 1990, Stanford re-incorporated Guardian Bank in Antigua and transferred all the assets of his Montserrat-licensed bank to the new Antiguan-licensed Guardian Bank.  By May 1991, Stanford's banking license was officially revoked by the Montserrat Government (although in 1994 Stanford sued the Government of Montserrat to have that order rescinded).  In effect, Stanford simply picked up his banking operations and moved them to Antigua, and continued the same basic business plan that had proven so profitable for Stanford in Montserrat.  Stanford eventually changed the name of his Antiguan bank from Guardian Bank to Stanford International Bank Ltd. in 1994.

### b.     Stanford Financial Group Creates a Safe Haven in Antigua

26.     Once established in Antigua, Stanford cultivated a symbiotic relationship with the local government.  Stanford Financial Group quickly became the island's largest private-sector employer and even bought the Antiguan newspaper, the Antiguan Sun.  Additionally, in return for political cover, Stanford Financial Group eventually became a *major* source of funding for the *entire* island, eventually loaning tens of millions of SIBL CD investors' dollars to the Antiguan government. By 2004, the island's government owed Stanford Financial Group over $87 million — nearly half its annual tax revenues — with certain loans secured by the government's tax revenues and medical fund.

27.     In fact, the Antiguan government's relationship with Stanford was so incestuous that Stanford himself actually *rewrote* Antigua's banking laws.  In 1996, Antigua began to suffer from the same suspicions that doomed Guardian Bank's operations in Montserrat, so Stanford approached

the Antiguan government about these emerging new threats to SIBL's operations in Antigua.  In June 1997, the Antiguan government formed the Antiguan Offshore Financial Sector Planning Committee, *appointing Stanford as chairman*, to advise the government and recommend changes to its banking laws.  Stanford then leveraged his new committee to *fund*, *organize*, and *appoint his agents* to a banking task force that was charged with amending Antigua's banking laws and supervising Antigua's banks.  In January 1998, Stanford's new task force (the "Stanford Task Force") recommended sweeping changes to Antigua's banking laws and regulatory institutions.  The Antiguan government later adopted these recommendations, which included highly suspicious amendments to the nation's Money Laundering (Prevention) Act.  Stanford also used his new Task Force, a precursor to Antigua's Financial Services Regulatory Commission ("FSRC"), to wrest control of Antigua's entire offshore banking industry, even stooping to the level of physically seizing bank records from the previous Antiguan banking regulators.

28.     Antigua's corruption and lax banking regulations are borne out by the Plea Agreement entered by Stanford Financial Group CFO Jim Davis (the "Davis Plea"), as well as by the June 18, 2009 federal grand jury indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and former head of Antigua's FSRC (the "Indictment").   The Davis Plea and Indictment allege that for years, King — while acting as the CEO of Antigua's FSRC — accepted bribes from Stanford and/or his associates in return for his assurance that the FSRC "looked the other way" and would not properly perform its regulatory functions or supervise SIBL.  In 2003, King even entered into a bizarre Voodoo-like "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford.  As part of this blood-brother relationship and bribery, King became Stanford's regulatory spy and "inside man" in terms of relaying

information to Stanford concerning the SEC's investigations of Stanford Financial Group and SIBL from 2005 all the way until 2009. All this was just part and parcel of Stanford's broader conspiracy to keep his Ponzi scheme alive by evading and obstructing regulation of SIBL's activities at every turn and in every country.

### c.      Stanford Financial Group Sells to Investors in the United States

29.      In November 1998, Stanford Financial Group needed new capital to sustain its Ponzi scheme, so SIBL filed a Regulation D exemption with the United States Securities and Exchange Commission ("SEC"). Stanford Financial Group used this exemption to sell SIBL CDs to U.S. "accredited investors" in the United States without registering them as securities. SIBL's initial Reg. D filing listed CD offerings totaling only $50 million.

30.      After the initial Reg. D filing in 1998, Stanford Financial Group began to exploit U.S. investors and its empire grew exponentially. SIBL filed an amended Reg. D in November 2001 to increase the CD offering amount to $150 million. SIBL filed two additional amendments in 2004 (March and then November) increasing the size of SIBL's offering to $200 million and then to $1 *billion*, clearly evidencing the mass sales of SIBL CDs taking place in the United States. Finally, in November 2007, SIBL filed yet another Reg. D amendment to increase the size of the offering to *$2 billion*. During those years, Stanford Financial Group sold CDs under the Reg. D offering to well in excess of 1,000 investors.

31.      By 2003, Stanford Financial Group had printed and distributed to its FAs some 30,000 offering brochures for SIBL CDs. In 2005, Stanford Financial Group began an intensive television advertising campaign in the United States, designed to promote the sale of SIBL CDs, which aired continuously until Stanford Financial Group collapsed in 2009. By March 2006, Stanford Financial

Group had distributed 4,424 SIBL CD "Accredited Investor" subscription agreements to investors under the Reg. D offering.

### d.      Stanford Financial Group Breeds Loyalty Through Lavish Incentives

32.      From 2004 to 2008, Stanford Financial Group grew into a high-powered sales and marketing juggernaut.  The different Stanford Financial Group sales offices competed with each other for SIBL CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars".  In order to market and sell the SIBL CDs, Stanford Financial Group established a commission structure that provided huge incentives for the Stanford Financial Group FAs, including those at SGC, to sell as many SIBL CDs as possible.  The FAs became addicted to these outrageous commissions — which they referred to as "bank crack" — and the FAs became more and more aggressive in pushing the SIBL CDs on innocent investors like Plaintiffs, despite the high-risk nature of the investments.  Specifically, SIBL paid disproportionately large commissions to SGC for the sale of its CDs:  SGC received a 3% commission upon each sale of a SIBL CD, with 1% going to the SGC broker that made the sale, and the FAs were eligible to receive an additional 1% trailing commission throughout the term of the CD.  Stanford Financial Group used this generous commission structure to recruit established financial advisers, and to reward those advisers for aggressively selling the SIBL CDs to investors.  Of course, commission and bonus structures like that used by SIBL are not typical, largely because they cannot be sustained economically.

### e.      Dissecting the Fraud

33.      The ultimate reality of Stanford Financial Group is that it was a Ponzi scheme based out of Houston, Texas.  In essence, Allen Stanford and his co-conspirators used Stanford Financial Group and the promise of SIBL CDs to lure investor money into SIBL or other Stanford Financial Group

companies, where the funds were then pooled and mostly used to invest in speculative, illiquid, and high-risk assets, and to personally enrich Allen Stanford and his co-conspirators, including billions of dollars spent to: (i) support Allen Stanford's and his co-conspirators' lavish lifestyles; (ii) issue bogus, unsecured personal "loans" to Allen Stanford; (iii) capitalize other entities wholly owned by Allen Stanford; and (iv) purchase private equity holdings and massive investments in Antiguan real estate.  None of the investors' money was segregated.  Instead, all investor money was commingled and then sprinkled across all kinds of purported investments, including private equity investments in the various companies that comprised Stanford Financial Group.  As such, Stanford Financial Group was violating the Investment Company Act by operating as an unregistered outlaw hedge fund and selling its internal securities product from Houston, Texas to Plaintiffs and other investors. Additionally, Section 47(b) of the Investment Company Act provides:

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.

15 U.S.C. § 80a-46.

34.    Stanford Financial Group was never registered nor authorized to operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs or members of any Class, who were consistently and uniformly told verbally and via Stanford Financial Group promotional materials that, e.g., the Stanford Financial Group based in Houston, Texas was compliant, authorized, and regulated by the SEC and Financial Industry Regulatory Authority ("FINRA"), and

backed by insurance coverage from the Securities Investor Protection Corporation ("SIPC") and Lloyd's of London.  Plaintiffs and other investors were never told the material fact that the acts of Stanford Financial Group and its unregistered investment company were *void as a matter of law* under Section 47 of the Investment Company Act.

35.     As part of the fraud committed on Plaintiffs and members of the Class, Stanford Financial Group also uniformly touted the high liquidity of SIBL's purported investment portfolio.  For example, in its marketing materials distributed to Plaintiffs and members of the Class from at  least 1995 through 2009, Stanford Financial Group emphasized the importance of the SIBL CD's liquidity, stating (under the heading "Depositor Security") that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors."  *None of that was true.* Likewise, Stanford Financial Group trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that the "liquidity/marketability of SIBL's invested assets" was the "most important factor to provide security to SIBL clients . . . ."  To ensure investors would buy the SIBL CDs, Stanford Financial Group, through its FAs, assured investor clients that SIBL's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice.

36.     In reality, however, billions of dollars in assets had been used by Allen Stanford and his co-conspirators to invest in high-risk, illiquid ventures and to personally enrich themselves, including substantial sums used to: (i) support Allen Stanford's and his co-conspirators' lavish lifestyles; (ii) issue bogus, unsecured personal "loans" to Allen Stanford in the amount of at least $1.8 billion; (iii) capitalize other entities wholly owned by Allen Stanford; and (iv) purchase private equity holdings in non-public companies and other Stanford Financial Group companies with massive investments in

Antiguan real estate and elsewhere in the Caribbean.  In fact, by 2008, Stanford Financial Group was essentially a real estate development fund, a crucial fact that was never disclosed to Plaintiffs or members of the Class.  And by the end of 2008, Stanford Financial Group could account for only a tiny fraction of SIBL's CD obligations.  These material facts were not only omitted from Stanford Financial Group's disclosures to investors, they were contrary to Stanford Financial Group's verbal and written statements to Plaintiffs and members of the Class, from 1995 through 2009, regarding SIBL's purported investment portfolio and use of investor funds.  Stanford Financial Group also failed to inform investors that hundreds of millions of dollars of depositor funds were used to create and perpetuate the charade of Stanford Financial Group's image, with lavish offices, excessive bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up Stanford Financial Group's image of wealth, power, and prestige.  None of this information was disclosed to Plaintiffs or members of the Class.

37.     As alleged in the Davis Plea and in the criminal Indictment of Allen Stanford and his associates, Stanford and Stanford Financial Group CFO Jim Davis fabricated SIBL's purported investment portfolio and lied to investors about the nature, size, and performance of that portfolio.  Gilberto Lopez and Mark Kuhrt, accountants for Stanford Financial Group, fabricated the financial statements based upon a pre-determined return on investment, typically provided by Stanford or Davis, which Lopez and Kuhrt used to reverse-engineer the bank's financial statements and report investment income that SIBL did not actually earn.  Information in SIBL's financial statements and annual reports to investors about the bank's purported investment portfolio bore *no* relationship to the actual performance or existence of the bank's purported investments.  SIBL's financial

statements and annual reports to investors were prepared, drafted, and approved by Stanford, Davis, Lopez and Kuhrt.  Stanford and Davis then signed these falsified financial statements.

38.     By the end of 2008, Stanford Financial Group had sold approximately $7.2 billion worth of SIBL CDs to Plaintiffs and other CD investors by touting:  (i) the bank's safety and security, including that invested funds were insured; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that exceeded those offered by commercial banks in the United States.  It was at this time in 2008, in the midst of the worldwide financial meltdown, that Stanford Financial Group began to crumble.

### f.     Stanford Financial Group's House of Cards Finally Collapses

39.     As alleged by the SEC and the United States Department of Justice, Allen Stanford and  Jim Davis — attempting to cover a hole in SIBL's purported balance sheet and thus satisfy minimum capital requirements — concocted a bogus $541 million shareholder equity infusion for the bank. The fake infusion involved a series of fraudulent "roundtrip" real estate deals where Stanford took some Antiguan property he purchased for $63 million, transferred it to some entities who "booked" it at $3.2 billion, and then transferred shares in those entities back to SIBL.

40.     In October 2008, Stanford Financial Group began suffering liquidity problems caused by a depositor "run" on SIBL that prevented SIBL from complying with client requests for funds transfers.   SIBL's CD transaction records indicate that approximately $2 billion in CDs were redeemed from January 1, 2008 through February 17, 2009.  These redemptions and volatile financial markets had a huge impact on the ability of Stanford Financial Group's FAs to keep clients pacified, and on Stanford Financial Group's ability to keep the Ponzi scheme afloat.  As a result,  the FAs were ordered to continue selling CDs to bring in new money and to discourage redemptions.

41.     In the wake of the Madoff scandal in January 2009, Venezuelan financial analyst Alex Dalmady, as a favor for a friend, performed an analysis of SIBL's returns over the years, taken from SIBL's *publicly available* Annual Reports, and then published his findings in a Venezuelan magazine under the title "Duck Tales."  His findings were then re-published in various blog postings.  Dalmady concluded that Stanford Financial Group was nothing but another investment Ponzi scheme — a Ponzi "duck".  The duck (or rather the cat) was out of the bag.

42.     In the background stood an increasingly skeptical SEC, which had been investigating Stanford Financial Group for four years.  The Madoff scandal renewed the intensity of the SEC's expanding investigation.  On February 4, 2009, in advance of a deposition before the SEC, Stanford Financial Group officials met with outside counsel in Miami.  Two days later, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Stanford an email, copying David Nanes, that illuminated Stanford Financial Group's crumbling empire:

> *[T]hings are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means.  There are real bullets out there with my name on [sic], David's name and many others and they are very real…[w]e are all in this together.*

43.     On February 17, 2009, the SEC filed a Complaint against SGC, SIBL, and other entities, as  well as against Allen Stanford and Jim Davis, in the U.S. District Court for the Northern District of Texas.  The SEC obtained an injunction to freeze the assets of Stanford Financial Group and Ralph S. Janvey was appointed to serve as Receiver to liquidate the Stanford Financial Group of companies.  On June 18, 2009, Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts, including wire and mail fraud, obstruction of an SEC investigation, and money laundering.  In August 2009, Jim Davis pled guilty

to several crimes, including conspiracy to commit securities fraud and conspiracy to obstruct an SEC proceeding. On March 6, 2012, Allen Stanford was convicted on multiple criminal counts, including wire fraud, mail fraud, obstruction of an SEC investigation, conspiracy to commit wire and mail fraud, conspiracy to obstruct an SEC investigation, and conspiracy to commit money laundering.

### D.      The Findings of this Court

44.      This Court has already found that the Stanford fraud was a Ponzi scheme. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."); *id.* at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."); *id.* at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . .").

45.      In an opinion filed on December 15, 2010, the Fifth Circuit agreed with this Court's findings that the Stanford fraud was a Ponzi scheme. *See Janvey v. Alguire*, 628 F.3d 164, 175 (5th Cir. 2010), *withdrawn and superseded on jurisdictional grounds*, *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011). In particular, the Fifth Circuit noted several observations about the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> * * *
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme ab initio.
>
> * * *

> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . . .
>
> * * *
>
> Here, the Receiver provided evidence of a massive Ponzi scheme . . . . The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized.

*Id.* at 176-80.

### E.   The SIBL CDs Were Required to Be Registered But Were Not

46.     This Ponzi scheme involved the sale, through an illegal, unregistered public offering, of SIBL CDs by SGC from Texas to investors in Texas, Florida, other States, and worldwide.

47.     The offering of SIBL CDs, conducted on a continuous basis from at least 2005 through 2008, was described in offering materials as a private placement, in which SGC purportedly offered the CDs under a federal registration exemption, Reg. D, which also purportedly applied in Texas and Florida under applicable state law.

48.     However, the offering of CDs was in fact an unregistered public offering made in violation of Article 581 of the Texas Act and Chapter 517 of the Florida Securities Investor Protection Act.   It was an integrated offering under Texas and Florida securities laws, and on information and belief, involved each of the following factors indicating that it was a public offering and not a private offering exempt from registration:

> a.   The integrated offering involved general solicitation.  This general solicitation by SIBL through SGC and its U.S. affiliates, agents and brokers included general public advertisements, publicly distributed magazine articles and other communications and media published in print and distributed broadly for general distribution in the United States (including in Texas and Florida) to offerees and purchasers of the CDs. SIBL

has acknowledged that it employed marketing literature other than its private placement memorandum on a regular basis.

b.   The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas and Florida, of the Stanford Financial products, including SIBL CDs.

c.   The integrated offering involved seminars and meetings conducted in the United States (including Texas and Florida) and Antigua, West Indies. The integrated offering was conducted through sales seminars, "road shows", and meetings directed at potential offerees and purchasers.  These meetings took place in the United States (including Texas) and in Antigua.

d.   The integrated offering involved offers to thousands of offerees and purchases by thousands of offerees.  The integrated offering involved offers to, and purchases by, at least hundreds of Texas and Florida residents or those otherwise subject to Texas or Florida law.

e.   The aggregate size of the sales of SIBL CDs during this period was several billion dollars.  The aggregate size of the sales in Texas during this period was at least several hundred million dollars.  The aggregate size of the sales in Florida during this period was at least several hundred million dollars.

f.   The offering was made to investors with whom SGC had no pre-existing relationship, through brokers of an affiliate of SGC who were paid substantial and excessive undisclosed commissions in connection with the CDs.

**F.      Pershing's Culpable Participation in the Fraud: Funding the Scheme**

49.      Pershing became involved with SGC in 2005, when SGC was looking to replace Bear Stearns as the custodian and clearing broker for its securities trades and custodial functions. Negotiations regarding the parameters of the relationship and the nature of the services to be provided by Pershing began in early 2005 and continued for roughly eight months throughout 2005.

50.      From the beginning, the SGC employees dealing with Pershing, including Danny Bogar, A.J. Rincon, and Bob Kramer, informed Pershing (through Pershing officers John Ward, Ron Artzi, Tres Arnett, and Ed Zelezen) about SIBL, the SIBL CD program, and the nature of the related party transactions between SGC and SIBL and the fact that SGC was marketing and offering the SIBL CDs to its brokerage and investment adviser customers and earning above-market referral fees, up to 3% of the value of the CD, for doing so.

51.      To establish its business relationship with SGC, Pershing performed a due diligence investigation of Stanford Financial Group's entire operation, which took place over a period of roughly eight months in 2005, and included Pershing's review of pending arbitration cases against SGC and review of the 1998 drug money laundering forfeiture case involving SIBL.  Upon information and belief, that due diligence also included a trip to Antigua to visit SIBL in July 2005 and meet with Antiguan regulators.

52.      During their due diligence review of Stanford's operations in June and July 2005, Pershing officials reviewed the financial statements of SGC and SIBL and became aware that: (i) SGC was utterly dependent for its survival on revenues from referral fees paid to SGC by SIBL for the marketing and promotion of the SIBL CDs, and (ii) the financial condition and financial statements of SIBL, an offshore bank with billions of dollars in deposits, much of which was obtained from

SGC, was audited (and had been audited consistently for 18 years by this point in 2005) by a one-man accounting firm in Antigua, C.A.S. Hewlett & Co., Ltd., that no one at Pershing had ever heard of before.

53.     Most multi-billion dollar investment funds go through rigorous audits by large and well-known audit firms and in fact, switch auditors every few years to avoid even the appearance of impropriety. This was not the case with SIBL and Pershing was aware of this fact.  Pershing quickly discovered that, from SIBL's inception to its closing, its sole auditing firm was Hewlett, a very small local firm in Antigua. The Hewlett firm lacked the apparent resources, credentials, reputation, and staff to audit a multi-billion dollar investment portfolio, and Pershing was aware of this fact.

54.     As part of its due diligence on Stanford's operations, Pershing also discovered that SIBL offered CD rates that were much greater than those offered by banks in the United States.  SIBL's yield ranged from a high of 388% of the yield available from FDIC insured banks in the United States in 2002 to a low of 140% of the U.S. bank yield in 2006.  According to its offering materials, reviewed by Pershing, SIBL purported to function like a hedge fund but, unlike a hedge fund, its customers were guaranteed (by SIBL) a specified return regardless of the fund's performance.  SIBL's reported returns were steady, fluctuating from 11.7% to 14.9% between 1997 and 2007.  SIBL showed a profit in good times and in bad.

55.     In reviewing SGC's financial information, including its audited financial statements, as part of its 2005 due diligence review, Pershing also discovered that without income related to the sale of the SIBL CDs, SGC would have been insolvent from at least 2004 forward (and likely before). Pershing realized that referral fees and other CD related compensation paid by SIBL to SGC constituted 71.65% of SGC's revenue for 2004; 63.62% for 2005; 65.01% for 2006; 50.8% for 2007;

and 52.83% for 2008.  Even when this CD related compensation from SIBL is considered along with other income received by SGC in the ordinary course of business, SGC showed negative cash flows from operations of $7,674,855 in 2004; $18,029,885 in 2005; $46,054,375 in 2006; $6,616,444 in 2007; and $35,102,135 as of November 30, 2008.  The only reason SGC's financial statements did not reflect negative cash flows between 2004 and 2008 is because SGC received millions of dollars in capital contributions from Stanford and/or other Stanford Financial related party entities. SGC received $10,000,000 in capital contributions in 2004; $21,000,000 in 2005;  $51,500,000 in 2006; $41,750,000 in 2007; and $51,000,000 in 2008.   All of this was reflected in SGC's financial statements reviewed by Pershing.

56.     Pershing executives also gained an understanding as to the composition of the Board of Directors of SIBL in 2005, and learned that an 83-year old friend of Stanford's father, O.Y. Goswick, a former rancher and car dealership owner, was listed in the SIBL annual reports as being somehow in charge of SIBL's multi-billion dollar investments portfolio.  Pershing officials also learned that the Chief Investment Officer for the entire Stanford operation, Laura Pendergest, had no real business or finance education or training, but instead was a college graduate from Mississippi State with a degree in Math.  Pershing executives Ward, Closs and Pershing Compliance Officer Claire Santaniello held a teleconference with Pendergest on August 31, 2005 to discuss the SIBL CD product and SIBL's investments and rates of return.  Pershing learned that essentially Jim Davis and Laura Pendergest managed the entire Stanford investment portfolio.  It is extremely unusual for such a small number of people to manage and control a multi-billion dollar investment portfolio. Most financial institutions search for and recruit the top talent in the market to manage portfolios of that size.  But not Stanford.

57.     From a regulatory perspective, Pershing learned that Stanford Financial Group had not registered the SIBL CDs for sale in the United States, and that SGC was selling the CDs under a Reg. D exemption.   Upon information and belief, Pershing reviewed SIBL's Reg. D filings, and knew that SIBL had amended its Reg. D filing in November 2004 to increase the dollar amount of the CD offering from $200 million (as stated in SIBL's March 2004 Reg. D filing) to *$1 billion*, an increase of $800 million (or 400%) in 8 months.   Pershing also knew that SGC had sold the CDs to more than 500 investors in the U.S.  Additionally, upon information and belief, Pershing also discovered the SEC's active investigation of Stanford Financial Group during this initial due diligence in 2005, particularly concerning SGC's regulatory and compliance issues.

58.     During this due diligence period in the summer of 2005, SGC employees also specifically informed the Pershing representatives that SGC would require a separate service from Pershing above and beyond the clearing and custody of securities trades:  international wire transfers to SIBL to fund the purchase of SIBL CDs by SGC customers.   The SGC employees explained to the Pershing representatives that SGC would require Pershing to wire transfer money from SGC's clients' accounts at SGC (in custody at Pershing) to SIBL for the purchase of the SIBL CDs, or to wire transfer funds from the SGC clients' accounts to STC for the purchase of SIBL CDs to be held in the clients' IRA accounts at STC.

59.     After concluding its lengthy and extensive due diligence review of Stanford Financial Group's operations and business model, on October 12, 2005, Pershing Managing Director John Ward sent an email to Mauricio Alvarado, Stanford Financial Group's General Counsel in which Pershing confirmed to Stanford that, as to the wire transfer business between SGC and SIBL, "[*w*]*e fully understand the nature of the relationship and the reason for these movements*".

60.     On October 18, 2005, as the parties neared the execution of the contractual documents that would govern their relationship going forward, Pershing Vice President Ron Artzi sent an email to Stanford Financial Group General Counsel Alvarado and Jane Bates, SGC's Chief Compliance Officer, stating that Pershing was "*excited to have the opportunity to partner*" with Stanford Financial Group, and that the Pershing representatives were confident that they "*thoroughly understand the unique compliance and legal requirements associated with servicing*" the business. Pershing thereafter referred to their relationship as a "partnership" and established the SGC account as a "Premier Partner" for Pershing.   Pershing also promised to take "***an active role in complimenting the future growth***" of SGC.

61.     SGC and Pershing executed the Fully Disclosed Clearing Agreement on December 27, 2005, and incorporated therein all of the schedules for pricing for all of the different services Pershing was to provide to SGC.  The same contractual relationship also applied to SGC's sister companies, SFIS and STC Louisiana, which handled and served as custodian/trustee for the IRA accounts for Stanford investors, the vast majority of which accounts were invested into the SIBL CDs.  Pershing served as the wire transfer intermediary for those accounts as well, wiring money from SGC to STC's account at Hancock Bank, after which the money was purportedly forwarded to SIBL for the purchase of CDs.

62.     Pershing actively participated and aided in the sale of unregistered securities and in the fraudulent sale of securities.  Under the Fully Disclosed Clearing Agreement, Pershing held all the SGC customers' assets and securities.  Pershing was also responsible for assessing whether or not to accept an order for processing, whether to execute a transaction in a customer account, and ensuring that the introducing broker was meeting net capital and other regulatory requirements.

63.      Pershing has admitted that it processed 1,600 wire transfers for SGC and STC customers and transferred more than $500 million to SIBL on behalf of Stanford investors, including Class Plaintiffs, for the purchase of SIBL CDs between 2006 and February 2009.  Said wire transfers were performed on behalf of some 1,200 individual SGC investor accounts.  During this same time period, Pershing earned over $24 million in fees from the Stanford Financial Group accounts.

64.      Pershing transferred money from SGC customers and their accounts to SIBL in Antigua, even though each of these thousands of wire transfers from a domestic account to an Antiguan "bank" for the purchase of a CD was highly unusual in and of itself.

65.      Upon information and belief, Pershing also extended credit to customers to enable them to purchase CDs, including by providing loan and margin financing for Stanford customers to purchase CDs.

66.      Pershing, a sophisticated and experienced clearing broker, acted with conscious indifference and with reckless disregard to the fact that the offering of SIBL CDs through SGC was an illegal, unregistered public offering.  For instance, Pershing ignored that: (i) SIBL generally solicited CD investors through television and other media ads; and (ii) many thousands of investors purchased the CDs.  Yet Pershing willingly lent its good name and reputation to enhance SIBL's and SGC's appearance of legitimacy for the sake of protecting its profits from the sales of unregistered CDs.

67.      In providing these services, Pershing acted with reckless disregard for the truth and the law because, as described above, Pershing became aware of multiple glaring red flags as a result of its due diligence review in 2005; knew that Stanford Financial Group was under investigation by the SEC; and developed deepening suspicions about the legitimacy of SIBL as early as June 2007, which suspicions grew exponentially throughout 2008.  Despite its knowledge of the formal SEC

investigation and despite its knowledge that no one seemed to know where the money from the CD sales was going or what assets backed up the SIBL CDs, Pershing recklessly continued to provide substantial assistance to Stanford Financial Group by transferring millions of dollars of Plaintiffs' money to SIBL to fund the purchase of SIBL CDs. Indeed, lured by the tens of millions of dollars in fees it was earning from the Stanford business, and despite Stanford Financial Group's consistent refusal to provide the verifiable backup on SIBL that Pershing itself demanded, *for an entire year*, concerning the composition of the SIBL portfolio, Pershing <u>still</u> did not stop this wire business until the day after the Madoff Ponzi scheme was unveiled.

68.     By June 2007 — after clearing SIBL CD purchases for over a year — Pershing had developed serious doubts about SIBL's legitimacy. On the regulatory front, Pershing had received regular updates from Young for nearly a year now regarding the SEC's formal investigation and inquiries from the NASD (as described in an August 6, 2007 email from Pershing's Ed Zelezen to Danny Bogar). On the operations front, Pershing had grown increasingly uncomfortable with SIBL's investment returns and SGC's reliance on referral fees from the bank.

69.     In a June 7, 2007 email entitled "Deepening our relationship", Pershing Managing Director John Ward wrote to SGC President Danny Bogar that Pershing's commitment to supporting Stanford Financial Group's growth required Pershing to gain a much deeper understanding of Stanford Financial Group's operations, including SGC's reliance on referral fees from the sale of SIBL CDs, and, importantly, *"the ability of SIBL to continue generating returns to pay these referral fees."* Ward also stated that Pershing needed to understand the composition of SIBL's portfolio. Ward concluded his email by requesting a meeting with Stanford Financial Group CFO Jim Davis and a visit to SIBL in Antigua by July 2007.

70.     Pershing executive Ed Zelezen followed up with an email request dated June 11, 2007 to Bernie Young, the new head of compliance for SGC, requesting the offering prospectus for SIBL CDs so that Pershing executive Tom Guinan, Chief Credit Officer, could review it.  Bernie Young complied and sent Pershing the SIBL offering package and disclosures.  After receiving and reviewing them, Pershing's Guinan wrote Young on June 15, 2007 noting that the SIBL CD disclosure documents and subscription agreement did not include any description of the underlying investments that comprised the SIBL portfolio or of where the assets were held.  Guinan informed Young that he would have expected to see that type of information in the prospectus, and requested that Young forward that information to him.  Young never did.

71.     Later in July 2007, Young delivered copies of SIBL's 2006 financial statements, audited by CAS Hewlett, to Pershing officer Richard Closs at the request of Pershing executive Ed Zelen.  Young also provided Pershing with continuing updates concerning the ongoing SEC investigation of Stanford Financial Group from the summer of 2006 through 2008.  Thus Pershing was aware throughout 2007 and 2008 that Stanford Financial Group was under investigation by the SEC.  In fact, during the entire period of time (December 2005 through February 2009) that Pershing was doing business with Stanford Financial Group, the SEC's regulatory investigation grew in scope and intensity, until by 2008 Stanford Financial Group was fending off investigations and responding to separate Subpoenas from the SEC, FINRA, Board of Governors of the Federal Reserve, and state regulators in Florida and Louisiana investigating the SFIS and STC offices.

72.     The Pershing executives thereafter held a meeting with Jim Davis and Danny Bogar in Memphis on August 8, 2007 to discuss, *inter alia*, SIBL's investment portfolio, the SIBL CD program, and the referral fees paid to SGC by SIBL.  After that meeting, on August 27, 2007, John

Ward sent an email to Danny Bogar and SGC CFO Chuck Weiser requesting, among other things, SIBL's investment policy statement, details on the external managers that managed SIBL's portfolio, and statements from the SIBL portfolio custodians reflecting asset totals maintained in custody. Danny Bogar forwarded that email to Jim Davis later that day, and told Davis that he would "wait awhile" before responding, but then would inform Pershing that Stanford Financial Group had not agreed to provide all of the things requested by Pershing.

73.    Thereafter Pershing's Ward pressed SGC's Bogar for a date to visit SIBL in Antigua.  SGC coordinated the trip for January 2008, and set up meetings between the Pershing representatives and Juan Rodriguez-Tolentino, the President of SIBL, and Leroy King, the head of the Financial Services Regulatory Commission ("FSRC"), the Antiguan regulatory body supposedly in charge of regulating SIBL.  On January 8, 2008, Ward wrote to Bogar that at the meeting with the FSRC, Pershing expected to be provided with documentation regarding SIBL's balance sheet, including "*the supporting paperwork that reflects the assets*".  Ward closed the email by stressing that "*it is important that we are able to leave with a clear picture of the assets and liabilities [of SIBL], and have been able to see work papers that evidence this.*"

74.    However, at the meetings in Antigua on January 10, 2008, Pershing discovered facts that were consistent with the warnings Pershing discovered as a result of its initial due diligence in 2005. Pershing discovered that the FSRC had no work papers or any other documentation of any kind evidencing or supporting the assets that SIBL claimed to own or that were reflected on its books. Pershing discovered at that meeting in January 2008 that there were only three bank examiners in the Antiguan FSRC who were responsible for examining and regulating all of the banks in Antigua. Pershing also discovered that it was the regular practice of the FSRC to just accept at face value

whatever SIBL told the FSRC about its financial condition and portfolio values, which was contrary to what SGC had previously represented to Pershing regarding the extent and magnitude of regulation of SIBL by the FSRC.   Pershing also became aware that, as a result of the FSRC not knowing anything about SIBL's portfolio, the only outside entity that supposedly had independent knowledge of SIBL's portfolio was C.A.S. Hewlett, the one-man accounting firm in Antigua that SIBL had used without interruption for 20 years and that Pershing had never heard of until its due diligence of SIBL in June and July 2005.  Pershing left Antigua without receiving the "clear picture" of SIBL's balance sheet that Pershing itself had demanded and stressed was so important to Pershing. Yet Pershing continued to do business with Stanford Financial Group for an *entire year* thereafter.

75.     Upon their return from Antigua, the Pershing officials debated internally as to what they needed to do to assuage their suspicions about SIBL.  But, despite its suspicions as to the makeup of the SIBL portfolio supporting the CDs, and the misrepresentations by SGC officials about the nature and extent of regulation by the Antiguan FSRC, and despite its knowledge that Stanford Financial Group's operation was under formal investigation by the SEC, Pershing determined in January 2008 that it would continue to do business with Stanford Financial Group, and would continue to provide the wire transfer service and help effectuate Class Plaintiffs' and the Class's purchase of SIBL CDs that Pershing had strong suspicions about.

76.     Instead of ceasing business, Pershing decided to give Stanford Financial Group another chance to prove itself, this time by requesting that Stanford Financial Group hire a "recognized" accounting firm to perform an analysis of SIBL's portfolio and provide an independent certification as to the assets held in the SIBL portfolio.   In making this request, Pershing clearly and unequivocally demonstrated that it had absolutely no confidence in the audits performed by SIBL's

long-standing Antiguan auditor, CAS Hewlett.  Ward wrote to Bogar on March 17, 2008 that, in order to satisfy itself about SIBL, Pershing would "*accept a certification by a U.S.-domiciled recognized accounting firm*" certifying that "*they have conducted a review of [SIBL's] assets and that in their professional opinion [the assets] are reflected accurately in [SIBL's] balance sheet*". Essentially Pershing was asking for a <u>*real audit*</u> of SIBL because, as Pershing knew or recklessly ignored in 2005, the Antiguan audits performed by CAS Hewlett were not reliable.

77.     Thereafter, Stanford Financial Group stalled and stonewalled Pershing for almost nine months, all the way into late November 2008, about pursuing and obtaining an independent audit or certification of SIBL's assets.  The stalling and stonewalling was blatant and obvious, and yet Pershing turned a blind eye, and recklessly continued to do business with Stanford Financial Group and continued to transfer investors' money into the Ponzi black hole that was SIBL, all the while earning millions of dollars in fees.

78.     In May 2008, SGC still had not retained a U.S.-based recognized accounting firm to conduct the audit of SIBL's portfolio.  Ward wrote to Bogar at SGC on May 19, 2008 asking Bogar to "let me have an idea of a date you believe the review can be completed by and results distributed".  He went on to inform Bogar, that "while the issue with [SIBL] is unresolved" he could not finalize any pricing discussions with SGC.

79.     In early June 2008, Ward sent another email to Bogar, expressing exactly what Pershing wanted to see from an audit of SIBL's portfolio:  (1) that the investments as reflected in the SIBL books and records reconcile to the offering materials and that said investments were placed with qualified custodians;  (2) that the custodians' records reconcile with SIBL's books and records;  and (3) that the investments were managed largely by independent managers and not by Stanford

Financial Group entities.  SGC never retained an independent audit firm to conduct this review as requested by Pershing.

80.      The summer of 2008 passed by without any resolution of the SIBL issue, and with repeated delays and stonewalling by SGC's Bogar.  Finally on August 18, 2008 Ward wrote to Bogar requesting a teleconference with himself and Frank LaSalla, another Managing Director and member of the Pershing Executive Committee.  This was because in July 2008, Bloomberg published an article stating that the SEC was "investigating sales of certificates of deposit by Stanford Group Company at its offshore bank, which has $6 billion in assets in Antigua." The article also noted that the SEC had issued subpoenas to two former SGC financial advisors, Charles Rawl and Mark Tidwell, who were allegedly forced to resign in 2007 because they refused to participate in SGC's "illegal and unethical" marketing methods.  The subpoenas sought information about the sale of SIBL CDs and requested copies of training materials on SIBL CD sales methods. The Bloomberg article was of course widely circulated and Pershing knew about it immediately.  As a result, Ward wrote to Bogar on August 29, 2008 requesting that Stanford Financial Group General Counsel Alvarado call Pershing executive Tres Arnett to discuss the Bloomberg press reports.  Everything Pershing had seen was screaming fraud and Ponzi scheme at Pershing, but ***still*** Pershing continued to do business with SGC and transfer money to SIBL and earn millions of dollars in fees for that business.

81.      In September 2008, several Pershing executives, including Pershing Chairman Richard Brueckner, were invited to attend a dinner in New York on September 25, 2008 with Allen Stanford himself and members of the Stanford Financial Group Advisory Board.  Before that dinner, on September 11, 2008 Ward wrote Bogar once again, asking him to move along the SIBL audit process

so that he (Ward) could reassure Pershing Chairman Brueckner.  Having received no response, Ward wrote to Bogar again on September 17, 2008 requesting yet again a teleconference to discuss the SIBL audit.   Still SGC did nothing, and Pershing continued to transfer money to SIBL.

82.      On October 10, 2008, Pershing executive Frank LaSalla wrote to SGC CFO Chuck Weiser and Bogar, and informed them that he could not "*stress enough how important it is for us to get this matter behind us as quickly as possible*."  Weiser forwarded that email immediately to Jim Davis. Still nothing was done.  Ward wrote to Weiser again on October 31, 2008 inquiring as to any updates.  Weiser again forwarded that communication to Jim Davis and Danny Bogar, telling them that "*I will need to tell them [Pershing] something early this week.   If we are not going to do this, we need to go to plan B.   I think plan B is getting [Stanford Financial Group General Counsel] Mauricio [Alvarado] involved*."   Bogar responded that he would discuss the Pershing issue with Alvarado.

83.      Alvarado then requested to hold a teleconference with Pershing's Ward and Tres Arnett, which was scheduled on November 11, 2008.  By this time, Stanford Financial Group was on the verge of collapse and was besieged by state and federal regulators from the SEC, FINRA,  Federal Reserve, State of Florida and State of Louisiana.  Still not satisfied with the answers they received from Alvarado during the November 11, 2008 teleconference, and with no progress on the independent audit, on November 24, 2008, Ward wrote to Bogar and informed him that Pershing needed an answer on the audit by December 1, 2008.  Ward warned that "*any further delay will be viewed as an indication the review will not get done*."  Of course, by this time, the "delay" had been going on for almost an entire year.  Bogar forwarded that email to Alvarado.

84.     Then on November 28, 2008 Bogar gave Pershing's Ward an answer (which was vetted first by Stanford Financial Group attorney Alvarado), telling Ward that getting the audit of SIBL's portfolio accomplished was not a pressing issue for Stanford Financial Group at that time.  Pershing mulled it over for a few more weeks, and then on December 12, 2008, Pershing informed Stanford Financial Group that it would no longer process wire transfers to SIBL for the purchase of the CDs, and that Pershing was increasing the escrow amount that Pershing required from SGC as a deposit from $500,000 to $5 million.   Bogar pleaded with Ward's superiors at Pershing to give SGC a few more days to adjust its procedures accordingly so that none of its clients got injured by the sudden change. Pershing agreed, and continued to allow the wire transfers for an additional 30 days – until January 12, 2009 – as long as they were processed through an intermediary escrow account SGC established at the Bank of Houston, which for years had served as one of the main banks for SIBL. But beginning on January 12, 2009, Pershing started to enforce the new restrictions, with Ward informing Bogar that Pershing had rejected two wire transfers going to Bank of Houston for the benefit of SIBL, and also informed Bogar that any future wire transfers bound for SIBL would be rejected no matter how they were routed.

85.     At that point Stanford Financial Group considered taking legal action against Pershing for its refusal to continue to fund the Ponzi scheme.  On January 13, 2009 Alvarado drafted a demand letter to be sent to Pershing on behalf of SGC stating:

> Pershing had the opportunity to perform due diligence on SGC, its business, and its affiliated companies to its complete satisfaction.  Pershing took over eight months to complete its due diligence, which included visits to SIBL, meetings with bank regulators with oversight over SIBL, and a review of extensive documentation concerning the bank….   In the end, Pershing assured SGC that it had satisfactorily completed its due diligence and that it was prepared to enter into a clearing agreement with SGC.…

**In the three years since Pershing completed its due diligence, there have been no material changes relating to SIBL or SGC's business with SIBL**. Accordingly, there can be no honest, good faith basis for Pershing's recent decision to refuse transactions with the bank (emphasis added).

86.     The information that Pershing gathered during 2007 and 2008 merely confirmed what Pershing already knew, or recklessly ignored, based on its initial due diligence and other investigation in 2005.  A little over a month later the SEC filed its civil enforcement action against SGC, SIBL and Allen Stanford, and the house of cards collapsed.  Upon information and belief, Pershing has since fired John Ward from employment with Pershing.

87.     In short, the unlawful sales of securities could not have been made but for Pershing's participation and aid.  Pershing played a necessary and critical role in the sale of the unregistered securities, which could not have occurred but for Pershing's conduct.  Pershing exercised professional judgment by participating and aiding in the illegal sale of unregistered securities as set forth throughout this complaint.

## IV.     INVESTOR CLASS PLAINTIFFS' CLAIMS

### A.     Basis for Claims

88.     All of the Class Plaintiffs invested in the Stanford Ponzi scheme by purchasing CDs or placing their money in other depository accounts with SIBL through their brokerage accounts at SGC, or trust accounts at SFIS, or IRA accounts held at STC.  Over the years that Plaintiffs purchased and maintained investments in SIBL, Plaintiffs were repeatedly and uniformly told, either directly by Stanford Financial Group FAs or via Stanford Financial Group promotional materials, that, *inter alia*:  (1) an investment in SIBL was safer than investing in U.S. banks because SIBL did not make loans but instead invested in a portfolio focused on safe and highly liquid instruments; (2) the assets held in SIBL's investment portfolio were more than sufficient to cover any and all CD liabilities;  (3) SIBL was fully and adequately regulated

by the Antiguan FSRC; and (4) that an investment in SIBL was completely safe and secure because it was guaranteed and insured by Lloyd's, was audited by an "outside" audit firm and subjected to regular, "stringent" risk management examinations.  All of this was false.

89.     During the time that Plaintiffs purchased and maintained investments in SIBL, Stanford Financial Group sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*: (1) SIBL was not regulated by the U.S. or any other government; (2) Plaintiffs' investments in SIBL were <u>not</u> insured; (3) Stanford Financial Group's sales representatives did not know how SIBL invested depositor funds or what assets comprised SIBL's purported portfolio;  (4) Stanford Financial Group was operating illegally as an unregistered investment company (whose contracts were thus void under § 47 of the federal Investment Company Act of 1940) soliciting and selling unregistered securities by, from and through Houston, Texas; (5) SIBL was not, in fact, a normal and customary bank, but instead operated more like a mutual fund or hedge fund; (6) billions of dollars of SIBL's assets had been used to (i) purchase speculative, illiquid, and high-risk investments, (ii) personally enrich Allen Stanford and other Stanford Financial Group employees, and (iii) maintain the façade of Stanford Financial Group's image of wealth, power, and prestige; and/or (7) that SIBL was not adequately regulated by the FSRC or any other entity and was audited only by a one man "mom and pop" audit shop under the control of Stanford Financial Group.

90.     Based on the representations and omissions of material fact made to Plaintiffs repeatedly and uniformly over the years, both in person by Stanford Financial Group FAs and via Stanford Financial Group promotional materials, Plaintiffs decided to invest money in, and maintain investments in, the SIBL CDs from at least 2006 through 2009.

91.     Plaintiffs Horacio and Annalisa Mendez were investor clients of SGC and STC.  In October 2007 the Mendez's were introduced to an SGC Financial Adviser named Patrick Cruickshank who operated out of the SGC Austin branch office.  Cruickshank made all of the typical representations and omissions to Mr. and Mrs. Mendez about Stanford Financial Group that were part of the training instilled in such advisers by Stanford Financial Group, as described herein.  During that initial meeting, Cruickshank convinced Mr. and Mrs. Mendez to invest their money in CDs issued by SIBL.

92.     Based on the representations and omissions, Mr. and Mrs. Mendez decided to invest their retirement savings in the SIBL CDs.  On October 5, 2007, Mr. and Mrs. Mendez invested $100,000 with Stanford Financial Group, wiring the money to Pershing LLC.  With that money, Plaintiffs purchased one SIBL "Flex CD" in the amount of $50,000  (SIBL Acc # 173185),  and they also purchased  another SIBL "Fixed CD" in the amount of $50,000 (SIBL Acc # 173184).

93.     Then in February 2008, when Mr. Mendez changed employers, Cruickshank convinced Mr. and Mrs. Mendez to "roll over" Mr. Mendez's IRA savings account into a new IRA account at STC. Thus on February 5, 2008, Mr. and Mrs. Mendez wired $300,000 via Pershing to an STC account at Hancock Bank of Louisiana for further credit to a bank account controlled by SIBL for further credit to the Mr. and Mrs. Mendez's new SIBL Account #300822.

94.     Later in 2008, based on the misrepresentations and omissions set forth above by an  SGC adviser in the Austin office, including  that the Mendez's investments in Stanford Financial Group continued to be safe and secure, Mr. and Mrs. Mendez made another investment in SIBL — this time using money that Mrs. Mendez was holding for the benefit of her nieces.  On September 17, 2008, Mr. and Mrs. Mendez wired $24,137.32 to their SGC account in custody at Pershing, and then Pershing wired that money out to SIBL Account #173185 to purchase the CD in that amount.

95.     All the money that Mr. and Mrs. Mendez invested in the CDs is now lost.

96.     Susan L. Blount hired Ray Deragon to act as her financial broker to manage her IRA accounts and other accounts.   In 2006, Deragon switched his employment to Stanford Group Company in Austin, Texas and convinced Ms. Blount to move her accounts to that company to continue to be managed by him.  Ms. Blount moved her accounts to the Stanford Group Company in approximately August 2006, where Deragon and Shawn Morgan managed her accounts.  Both Deragon and Morgan were listed as Vice Presidents of Stanford Group Company on the paperwork they submitted to Ms. Blount.

97.     In September 2006, Deragon and Morgan presented Blount with a presentation regarding the management of her assets.  In relation to her retirement asset allocation, they included a bullet point for "Investment alternatives for implementation of the asset allocation with more stable and predictable income generation" that included a sub-bullet for the discussion of "High-yielding CDs from Stanford International Bank."   Soon thereafter, on December 13, 2006, at Deragon's and Morgan's recommendation, and based on the misrepresentations and omissions set forth above, Ms. Blount purchased the SIBL CDs for $250,000.00 by withdrawing this money from her IRA rollover account for which Pershing acted as the clearing house.

98.     Deragon and Morgan did not disclose to Ms. Blount that the SIBL was not a real bank, nor did they disclose that it actually operated more like a mutual fund or hedge fund.  Deragon and Morgan never recommended that Ms. Blount sell the CD or remove it from her accounts.  In fact, Deragon and Morgan routinely informed Ms. Blount that the CD was performing quite well.  All of the money Ms. Blount was convinced to invest in the SIBL CDs is now lost.

99.     Lynne Turk was a resident of the State of Florida at the time she purchased two CDs issued by SIBL in the combined principal amount of $550,000.  On or about January 17, 2007, Ms. Turk purchased a SIBL Fixed CD-USAI in the principal amount of $250,000 (SIBL Acct. No. 000158510) in the name of the Trust.  Ms. Turk's records relating to this purchase are incomplete, but on information and belief, the funds used to purchase the January 17, 2007 CD were cleared through Pershing.  Ms. Turk purchased a second SIBL Fixed CD-USAI, dated August 1, 2008, in the amount of $300,000 (SIBL Acct. No. 311599) in the name of the Trust.  The funds used to purchase the August 1, 2008 CD were cleared through Pershing.  Ms. Turk purchased these two CDs based on the misrepresentations and omissions set forth above.

### B.     Class Allegations

100.    Class Plaintiffs request this case be certified as a class action pursuant to FRCP 23. Thousands of investors still had money invested in the SIBL CDs and other depository accounts at SIBL through SGC and/or STC as of February 2009.  The numbers of affected investors are so numerous that joinder of all members is impracticable.  For example, the Texas-residents alone number 1,300 investors and account for $581 million in investment losses.  There are common questions of law and fact that are common to the class and these common questions predominate over individual issues.  The Named Plaintiffs' claims are typical of the class claims.  The Named Plaintiffs have no interest adverse to the interests of other members of the Class.  The Named Plaintiffs will fairly and adequately protect the class' interests.  The Named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international securities litigation.

101.     Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses:

(i) a class of all investors who, as of February 16, 2009, had purchased and still held     SIBL CDs and/or otherwise maintained deposit accounts with SIBL through brokerage accounts established at SGC or IRA accounts at STC;  or in the alternative, certification of:

(ii) a class of all investors who, as of February 16, 2009, had purchased and still held     SIBL CDs and/or otherwise maintained deposit accounts with SIBL through brokerage accounts established at SGC or IRA accounts at STC, and whose funds were wire transferred by Pershing    to fund the purchase of SIBL CDs between December 27, 2005 and February 16, 2009; or in the further alternative, certification of:

(iii) a class of all investors who, as of February 16, 2009, had purchased and still held SIBL CDs, where the purchase involved funds transferred to, from or through Pershing, or that in any way involved Pershing, between December 27, 2005 and February 16, 2009, and who were residents of the State of Texas or otherwise subject to Texas law at the time of the purchase; and/or:

(iv) a class of all investors who, as of February 16, 2009, had purchased and still held    SIBL CDs, where the purchase involved funds transferred to, from or through Pershing, or that in any way involved Pershing between December 27, 2005 and February 16, 2009, and who were residents of the State of Florida or otherwise subject to Florida law at the time of the purchase.

AND such other classes or sub-classes as the Court may determine.

Excluded from the class are:

a.     Defendants, and their employees and agents; and

b.    Any officer, director, employee, or promoter of Stanford Financial Group, including SIBL, SGC, SFIS, or STC as those entities have been defined herein.

102.    The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Indeed, this is a case of "fraud created the market" and fraud on the regulators because Stanford Financial Group's fraud could not have existed or flourished were it not for the fraud Stanford Financial Group committed on regulators around the world and the fraud Stanford Financial Group committed by misleading investors into believing that their investments in SIBL were backed up by a liquid portfolio of assets.  The Class Plaintiffs and the Class partly relied on the integrity of the market in deciding to invest in the SIBL CDs.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

C.    **Discovery Rule/Inquiry Notice**

103.    The SEC filed an action against Allen Stanford and SIBL *et al*. on February 17, 2009, and on that same day the Receiver was appointed.  Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial Group, SIBL, SGC, STC, or Pershing until then.  Moreover, the wrongful acts and conspiracy by Pershing was inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Pershing's role in Stanford Financial Group's fraud until now.

### D.    Class Causes of Action

#### (THE FOLLOWING CAUSES OF ACTION ARE PLEAD ON behalf OF THE CLASS PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED)

#### COUNT 1:    Participation in Breach of Fiduciary Duty

104.    As a registered investment adviser, SGC owed fiduciary duties to the Class Plaintiffs and the Class as a matter of law.  As a fiduciary trust company holding IRA accounts, STC also owed fiduciary duties to the Plaintiffs and STC investors in the Class.  SGC and STC breached their respective fiduciary duties to Class Plaintiffs and the Class by advising them to invest their money in SIBL CDs, because such investments were entirely imprudent and unsuitable for any investor and because SGC and STC were financially incentivized to recommend the related-party SIBL CDs above other investment products.  SGC and STC did not have the basic financial information regarding the SIBL investment necessary to make such investment recommendations to Class Plaintiffs and the Class, but instead made the recommendations to purchase SIBL CDs based on the huge, above-market commissions SGC and STC were paid by SIBL to promote the CDs.  SGC also breached its fiduciary duties to Class Plaintiffs and the Class by advising them to invest their money in SIBL CDs even though SGC lacked sufficient information regarding SIBL and SIBL's purported investment portfolio to properly recommend such investments.

105.    Pershing knew that SGC and STC owed their respective fiduciary duties to Class Plaintiffs and the Class, and Pershing knew that SGC and STC were breaching said fiduciary duties, as described herein.  With full knowledge that SGC and STC were breaching their fiduciary duties to Class Plaintiffs and the Class, Pershing conspired with and aided and abetted and otherwise participated in SGC's and STC's breaches of those duties by the conduct alleged herein.  Pershing's participation in breaches of fiduciary duties is a proximate cause of actual damages to Class

Plaintiffs and the Class.   Pershing knew or should have known that its aiding, abetting and participation in the breaches of fiduciary duties set out above likely would result in extraordinary harm to Class Plaintiffs and the Class.   Accordingly, Class Plaintiffs are entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this court.

### COUNT 2:   Aiding and Abetting Violations of the Texas Securities Act

#### A. SALES OF UNREGISTERED SECURITIES

106.    Pershing is liable as an "aider" for sales of unregistered securities to Plaintiffs.  In particular, by its actions described herein, Pershing provided substantial assistance to SGC, STC and SIBL and made it possible for SGC, STC and SIBL to effectuate the sale of the CDs to Plaintiffs and others and materially aided SGC, STC and SIBL to sell unregistered securities to Plaintiffs from, by and through Texas.   As argued by the SEC in its original Complaint, the CDs offered and sold by Stanford Financial Group and SIBL, with Defendant's participation, constitute "securities" under the relevant securities law jurisprudence, primarily the *Reves* test, precisely because the CDs were not insured by the FDIC, or guaranteed by any similar government regulatory insurance regime.  By agreeing to assist SGC, STC and SIBL to effectuate the sales of these securities products, Pershing acted recklessly and knew or should have known that said sales were illegal.   But for Defendant's participation, SGC, STC and SIBL could not have sold unregistered securities to Class Plaintiffs and the Class from, by and through Texas.

107.    Defendant had general awareness that it was assisting in the sale of unregistered securities from, by and through Texas.  Defendant performed an extensive due diligence on Stanford Financial Group, and knew that SGC was based in Texas and was selling CDs issued by an offshore bank it controlled from Texas, and knew that SIBL did not function as a regular bank making loans but,

rather, invested the CD proceeds in a private investment portfolio. Defendant also knew that the CDs being peddled directly from Houston, Texas had not been registered as securities with the SEC or the Texas State Securities Board, because Defendants knew that SIBL had filed for a limited Reg. D exemption for certain "accredited" U.S. investors only. Based on its due diligence, the size of the CD offerings, the way the CDs were marketed to the public, and what SIBL was allegedly doing with the money, Pershing also knew that the Reg. D exemption did not apply and that Stanford Financial Group was operating as an unregistered mutual or hedge fund in violation of the Investment Company Act, selling unregistered investment company securities.

108.    In assisting a Houston-based enterprise in the sale of unregistered securities, Defendant was at the very least subjectively conscious of a risk of illegality. None of the CDs sold to Plaintiffs were ever registered with the Texas State Securities Board and therefore they were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act. In assisting SGC and SIBL effectuate the sale of the unregistered securities from, by and through Texas, Defendant acted intentionally or with reckless disregard for the truth and the law. As a result of Defendant's conduct in materially aiding SGC and SIBL to sell unregistered securities from, by and through Texas, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission. In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

109.    Moreover, and despite SGC's scheme to evade compliance with the Texas Act by claiming a Reg D exemption, the global offering of CDs by Houston-based Stanford Financial Group to "accredited" U.S. investors was in fact an unregistered public offering made in violation of Article

581 of the Texas Act.  It was an integrated offering under Texas securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from registration:

a.   The integrated offering involved general solicitation. This general solicitation by Stanford Financial Group through SGC, STC, SFIS and its U.S. affiliates, agents and brokers, as well by the foreign financial advisors, included general public advertisements, publicly distributed magazine articles, television and other communications and media published in print in Houston, Texas and distributed broadly for general distribution in the United States and abroad to offerees and purchasers of the CDs.

b.   The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas, Louisiana and Florida, of Stanford Financial's products, including the CDs.

c.   The integrated offering involved seminars and meetings conducted in the United States (including Texas, Louisiana, and Florida), Mexico and Venezuela and elsewhere in Latin America.  The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

d.   The integrated offering involved offers to tens of thousands of offerees and purchases by thousands of offerees involving sums of money, in the billions of dollars, far in excess of that disclosed to the SEC in SIBL's Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of Texas, Louisiana, and Florida residents or those otherwise subject to Texas, Louisiana, or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of Stanford Financial Group and/or SFIS.

e.  The aggregate size of the sales of CDs during this period was approximately $7.2 billion. The aggregate size of the sales in the United States from this period was in excess of $1.5 billion.  The number of investors purchasing the CDs in the U.S. under the Reg. D filing was far in excess of 1,000, and Pershing knew this because it wire transferred money from 1,200 different SGC accounts to buy the SIBL CDs.

f.  The offering was made to investors with whom Stanford Financial Group/SGC had no pre-existing relationship, through brokers or affiliates of Stanford Financial Group who were paid substantial and excessive undisclosed commissions in connection with the CDs.

g.  The offering was made to persons who did not qualify as "accredited United States investors"; and far more than 35 persons who did not qualify as "accredited United States investors" purchased the CDs; indeed the vast majority, at least $5 billion of the CDs, were sold to foreign citizens that did not qualify as "accredited United States investors".

## B. SALES OF SECURITIES BY UNREGISTERED DEALERS

110.    Defendant aided and abetted SIBL and Stanford Financial Group in the sale of securities to Plaintiffs from, by and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act.  Specifically, and as alleged herein, Defendant knew or should have known that the global conglomeration of entities known collectively as "Stanford Financial" was acting as a hedge or mutual fund without being registered as such under the Investment Company Act, and that the hedge or mutual fund was disguising itself as a bank (SIBL) and issuing hedge/mutual fund shares, disguised as CDs, to the general public from, by and through Texas and then pooling its customers' money together to make illiquid, speculative

investments.  The Stanford Financial Group "fund" made these sales without registering with the Texas State Securities Board as a dealer under Section 12(A).

111.     Defendant intentionally and actively aided and abetted the Stanford Financial Group "fund" to operate in and from Texas to sell securities from, by, and through Texas, by means of the conduct described herein. With full knowledge that Stanford Financial Group was, directly or through its web of affiliated companies, including SIBL, acting as an unregistered investment company "fund" in Texas selling "fund" securities from, by, and through Texas, and that Stanford Financial Group/SIBL were being operated and "run" from Texas, Defendants aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial Group and SIBL's violations of the Texas Securities Act by continuing to provide the wire transfer and other services described herein to effectuate the sale of the worthless CDs and fund the Ponzi scheme.

112.     Defendant had general awareness that it was assisting the sales by an unregistered "fund" of unregistered "fund" securities from, by, and through Texas.  In assisting the sale of unregistered "fund" securities through a Houston-based enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality.  In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendant acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law.  As a result of Defendant's conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission.   In the alternative, Defendant's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIBL as

stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

## C.   UNTRUTH OR OMISSION

113.     Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial Group and SIBL and their principals in the sale of uncovered securities through the use of untrue representations or materially misleading omissions, and also aided and abetted the fraudulent practices of registered investment advisers in violation of the TSA.  In particular, and as set forth in the Davis Plea, Stanford Financial Group was a massive Ponzi scheme that was perpetuated by the continued sales of the SIBL CDs to unsuspecting investors like Plaintiffs.  Stanford Financial Group led Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial Group's Houston office, to believe that their money was being invested in safe, liquid investments that were insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and then mostly used to: (i) purchase long-term, illiquid and high-risk investments, including real estate development projects in Antigua and elsewhere in the Caribbean; (ii) personally enrich Allen Stanford and other Stanford Financial Group employees, including funding their lavish lifestyles; and (iii) maintain Stanford Financial Group's image of wealth, power, and prestige.  Stanford Financial Group's investment adviser and broker/dealer, SGC, also omitted to inform investors like Plaintiffs that SGC lacked sufficient information regarding SIBL and SIBL's purported investment portfolio for SGC to properly recommend any investments in SIBL CDs.  Moreover, Stanford Financial Group omitted to inform investors like Plaintiffs that it was selling them unregistered securities and that it was operating as

an unregistered, uninsured, illegal investment company "fund" in violation of the Investment Company Act and the Texas Securities Act.

114.     Defendants had general awareness that they were involved in improper activity and that they were assisting the sale of unregistered securities from and through Texas.  With knowledge that SGC and STC were misleading investors about the nature and risk of investments in related party bank SIBL, and with reckless disregard for the truth and the law, Defendants provided substantial assistance to Stanford Financial Group in the effectuation of $500 million worth of CD purchase transactions as described herein, and thereby materially aided SGC and STC's sales of securities through the use of untruths and materially misleading omissions.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct.   In assisting the sale of securities through a Houston-based enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality.  In short, Defendants' actions as described herein allowed SGC and STC (and Stanford Financial Group) to continue to sell securities to Plaintiffs from and through Texas using untruths and materially misleading omissions.

115.     In performing the acts described herein to aid and abet the sale of securities through the use of untruths and materially misleading omissions, Defendants acted with the intent to perpetuate the sale of securities by Stanford Financial Group, or acted with reckless disregard for the truth or the law.   In fact, Defendants acted with wanton and arrogant disregard for the truth and for the protections afforded by the Texas Securities Act by engaging in the conduct described herein. Defendants' actions in aiding and abetting Stanford Financial Group's fraud.   As a result of Defendants' conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments and are entitled

to the statutory remedy of rescission.     In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIBL as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### D. CO-CONSPIRATOR LIABILITY

116.     Defendants are jointly and severally liable as co-conspirators for Stanford Financial Group and SIBL's primary violations of the Texas Securities Act.  In particular, Defendants knowingly combined together and with others at Stanford Financial Group to assist Stanford Financial Group to sell unregistered securities from, by and through the State of Texas using untrue representations or materially misleading omissions pertaining to insurance coverage for SIBL.  As described herein, Defendants took various overt acts designed to assist Stanford Financial Group to accomplish the goal of selling CDs from, by and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas.  Defendants' conspiracy with Stanford Financial Group to violate the Texas Securities Act is a proximate cause of rescission and/or actual damages to Plaintiffs, being the difference between their investments in SIBL as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### COUNT 3:     Violations of the Florida Securities Act

117.     This is a claim against Pershing for violations of Chapter 517 of the Florida Securities Investor Protection Act arising from the sale of unregistered securities in the State of Florida.  The offers of CDs to residents of Florida, and non-residents of Florida whose CD purchases are subject to Florida law, violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

118.     Section 517.07 provides that "it is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security of transaction is "exempt" under Chapter 517, unless the security is "registered pursuant to this chapter."

119.     The CDs are securities as defined in section 517.021(21), Florida Statutes. The CDs and CD transactions are not exempt from registration under the Florida Act, nor were the CDs properly registered as required.  Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

120.     Pershing acted as an agent for seller SIB and its affiliated entities, including SGC, and Pershing personally participated in and/or aided in the sale of CDs with knowledge that the offer was not exempt from Florida registration requirements.

121.     Pursuant to section 517.211, Florida Statutes, Plaintiffs in the Florida sub-class are entitled to recover recessionary damages or actual damages together with interest thereon.

## COUNT 4:     Negligence / Gross Negligence

122.     In the alternative, Defendant committed various acts and/or omissions of negligence which were a proximate cause of Plaintiffs' damages.  Such acts and/or omissions violated the standard of care and the duty owed by a securities custodian exercising reasonable prudence to ensure that it does not transfer custodial funds into a fraud or Ponzi scheme when it knows or has reason to suspect the existence of a fraud or Ponzi scheme.   In this case, Pershing suspected and had reason to know that Stanford Financial Group was a Ponzi scheme since at least June 2007, if not before, and yet turned a blind eye and instead recklessly transferred investors' money to purchase the SIBL CDs all the way until January 13, 2009.

123.     Each of the acts and/or omissions by Pershing described herein, singularly or in combination with others, constitutes negligence and each proximately caused the incident made the basis of this action and damages sustained by Plaintiffs.  Moreover, the negligence of Defendant in violating the standard of care, as set out above, constitutes negligence as a matter of law.

124.     Defendant's actions and inaction also constitute gross negligence.  Defendant's wrongful acts were aggravated by the kind of conduct which, when viewed objectively from Defendant's perspective at the time the acts occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiffs and others.  Defendant was subjectively aware of the risks involved, but proceded with conscious indifference to their duties and to the rights and welfare of Plaintiffs.  As a result Plaintiffs seek exemplary damages for Defendant's gross negligence.

## VII.     RESPONDEAT SUPERIOR

125.     Defendant is liable for the tortious and negligent acts of its employees, including without limitation, John Ward.  Ward and the other Pershing employees identified in this Complaint were acting within the course and scope of their employment with Defendant, and in furtherance of their respective principals' businesses, when they engaged in the wrongful conduct described herein.

## VIII.     ACTUAL DAMAGES

126.     Plaintiffs and the Class have suffered the loss of at least $500 million that was proximately caused by the wrongful conduct of Defendants as described herein.  Defendants are jointly and severally liable for the injury caused by Allen Stanford, Stanford Financial Group and SIBL under Texas common law of joint and several liability as well as under the Texas Securities Act.

## IX.   PUNITIVE DAMAGES

127.    The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code.  Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendant and to deter similar conduct of others in the future.

128.    All conditions precedent to filing this Complaint have been met.

## X.   JURY DEMAND

129.    Plaintiffs demand a trial by jury.

## PRAYER

WHEREFORE, Class Plaintiffs pray the Defendant be summoned to answer this Complaint, that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the class, classes and/or sub-classes as set forth in each cause of action hereof recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Class Plaintiffs pray for such other relief to which they may be justly entitled.

Dated: June 18, 2012

Respectfully submitted,


**CASTILLO SNYDER, P.C.**


By:  /s/ Edward C. Snyder
      Edward C. Snyder
      esnyder@casnlaw.com
      Jesse R. Castillo
      jcastillo@casnlaw.com
      300 Convent Street, Suite 1020
      San Antonio, Texas  78205
      (210) 630-4200
      (210) 630-4210 (Facsimile)

**LEAD CLASS COUNSEL AND
ATTORNEYS IN CHARGE
FOR PLAINTIFFS AND THE
PUTATIVE CLASS**


**STRASBURGER & PRICE, LLP**

By:  /s/ Edward F. Valdespino
      Edward F. Valdespino
      edward.valdespino@strasburger.com
      Andrew L. Kerr
      andrew.kerr@strasburger.com
      300 Convent Street, Suite 900
      San Antonio, Texas 78205
      (210) 250-6000
      (210) 250-6100 (Facsimile)

**MORGENSTERN & BLUE, LLC**

By:  /s/ Peter D. Morgenstern
        Peter D. Morgenstern (*admitted pro hac vice*)
        pmorgenstern@mfbnyc.com
        885 Third Avenue
        New York, New York 10022
        (212) 750-6776
        (212) 750-3128 (Facsimile)


**NELIGAN FOLEY, LLP**

By:  /s/ Nicholas A. Foley
        Nicholas A. Foley
        nfoley@neliganlaw.com
        Douglas J. Buncher
        dbuncher@neliganlaw.com
        Republic Center
        325 N. St. Paul, Suite 3600
        Dallas, Texas  75201
        (214) 840-5320
        (214) 840-5301 (Facsimile)


**HOHMANN, TAUBE & SUMMERS, L.L.P.**

By:  /s/ Guy M. Hohmann
        Guy M. Hohmann
        State Bar No. 09813100
        Joseph Brophy
        State Bar No. 00787146
        Ryan T. Shelton
        State Bar No. 24037484
        100 Congress Avenue, 18th Floor
        Austin, Texas 78701
        (512) 472-5997
        (512) 472-5248 (FAX)
        guyh@hts-law.com
        joeb@hts-law.com
        ryans@hts-law.com

**GEORGE & BROTHERS, LLP**

By:  /s/ R. James George, Jr.
   R. James George, Jr.
   State Bar No. 07810000
   Gary L. Lewis
   State Bar No. 12277490
   114 W. Seventh Street, Suite 1100
   Austin, Texas 78701
   (512) 495-1400
   (512) 499-0094 (FAX)
   rjgeorge@georgeandbrothers.com
   gllewis@georgeandbrothers.com

**BEASLEY HAUSER KRAMER
& GALARDI, P.A.**

By:  /s/ Joseph G. Galardi
   James W. Beasley, Jr.
   Florida Bar No. 145750
   Joseph G. Galardi
   Florida Bar No. 0180572
   Flagler Center, Suite 1500
   505 South Flagler Drive
   West Palm Beach, Florida 33401
   (561) 835-0900
   (561) 835-0939 (FAX)
   galardi@beasleylaw.net

BLACKNER, STONE & ASSOCIATES

By:  /s/ Lesley Blackner
   Lesley Blackner, Esquire
   Florida Bar No. 654043
   123 Australian Avenue
   Palm Beach, FL  33480
   (561) 659-5754
   (561) 659-3184 (FAX)
   lblackner@aol.com

### CERTIFICATE OF SERVICE

On June 18, 2012, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve Defendants individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Ryan T. Shelton
Ryan T. Shelton